CURRY v. COMMISSIONER OF INTERNAL REVENUE.

No. 10.

Circuit Court of Appeals, Second Circuit.

Feb. 3, 1941.

Morris A. Schoenfeld, of New York City (Morris A. Schoenfeld and Max Bergman, both of New York City, of counsel), for petitioner Bernard F. Curry.

Samuel O. Clark, Jr., Asst. Atty. Gen., and J. Louis Monarch and Harry Marselli, Sp. Assts. to the Atty. Gen., for respondent Commissioner of Internal Revenue.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The question before us is whether the petitioner Curry in computing his taxable income for the year 1933 was entitled to deduct $15,518.52 on account of a debt ascertained in that year to be worthless. The Board of Tax Appeals held that he was not entitled to such a deduction in 1933 because the debt had been ascertained to be worthless in 1932. We think that its decision was right and should be affirmed.

Reuben Barnett, who was a friend and the accountant of the taxpayer, suggested to him the idea of advancing money to the Leonard Advertising Corporation, of which Barnett was the treasurer and Harry J. Leonard and F. B. Leonard were also officers.

The Advertising Corporation had an advertising scheme involving the installation of grandfather clocks displaying advertising by means of an apparatus behind the face of the clocks which caused the name of the advertiser to be flashed on the dial. Advertisers signed contracts attached to which were notes payable at specified intervals in consideration of which the Advertising Corporation agreed to keep the clocks installed, operating regularly and in good order during the life of the contracts. In other words, the notes of the advertisers were conditional obligations dependent on the clocks being installed within the life of the notes, and serviced and kept in good condition. It was agreed between the clock owners, the Advertising Corporation, and the advertisers that the monthly payments on the notes would not have to be made so long as there was default in the matter of the installation and servicing of the clocks.

Barnett suggested to the taxpayer the idea of advancing to the Advertising Corporation money on the notes which were executed and delivered to it by the advertisers. After the taxpayer had discussed the matter with a banker and ascertained that the bank would discount the notes upon the taxpayer's endorsement, the latter made an arrangement for advancing money to the Advertising Corporation whereby he was to advance 80 per cent. of the face of the notes given by the advertisers contracting for the grandfather clock advertising service, for the doing of which he was to receive 10 per cent. of the advertisers' notes. These notes were delivered to the taxpayer as collateral security for the indebtedness of the Advertising Corporation and were turned over by him to the bank to secure his indebtedness to it.

The taxpayer started buying the notes in 1927 and stopped in 1928. The notes matured in 1929. He had advanced altogether $58,941.32 including interest, and received back in all $17,110.26. He received payment upon his advances pretty regularly until 1929. The officers of the Advertising Corporation explained the cessation of payments after that time by saying that they were having trouble with the works of the clocks which caused a great deal of expense on service and that the manufacturers had some corrections in them to be made and were getting out a new model.

The taxpayer received no payments on account of the notes in 1930, and in 1931 only received $210.26. In 1929 or 1930 he had been notified by the bank that the collateral notes were not in good condition for collection, and in 1932 he asked Barnett to go out and verify the condition of the advertising contracts. The latter collected only about $300 on account of the notes which was largely consumed in the expenses of his trip. Disgusted with this situation, in July, 1932, the taxpayer turned over certain notes for collection to his lawyer, Morris A. Schoenfeld. These were

notes on which advances had been made after June 26, 1927. On September 15, 1932, the latter wrote that the Advertising Corporation had gone out of business, that the two Leonards had left New York and were in St. Louis and that there was a balance of $7,476.91 due on advances made on notes up to June 26, 1927, which was a sure loss. The taxpayer accordingly charged it off and claimed it as a deduction from his income for 1932, and it was allowed by the Board.

In the letter of September 15, Mr. Schoenfeld added in respect to the notes securing the advances after June 26, 1927:

"I will endeavor to see what can be done with the list of notes you have given me and will report to you as soon as I have investigated them.

"Being that you have the endorsement of the Leonard Corporation we could take judgment against that corporation but it would be of no avail. Neither would it do us any good to take a judgment against the two Leonard boys as I understand they have nothing."

The last-mentioned notes which were turned over to Schoenfeld on July 2, 1932, aggregated $39,800.83 against which as collateral the taxpayer had advanced $25,-500, but out of them he had received nothing. On December 20, 1933, Mr. Schoenfeld wrote the taxpayer that he might deduct $15,518.52 from his 1933 income as a loss upon the advances made on the notes turned over for collection on July 2, 1932, but said that there was "a possible chance of collection" of certain of these notes aggregating $9,981.48 which were payable in New York State. In other words, even after charging off $15,518.52 in 1933 as a bad debt, there would still remain $9,981.-48 of accounts to be collected or charged off as a bad debt in some year subsequent to 1933. There was no proof that any part of either the $15,518.52 or the $9,981.48 item was ever collected. The taxpayer was told by Schoenfeld in the letter of September 15, 1932, that the Advertising Corporation had gone out of business and the Leonards had left New York. As far back as 1929 or 1930 the bank had given a gloomy report on the collateral notes and no substantial collections had apparently been possible since 1929. It seems to have been the fact, however, that the taxpayer was from time to time assured by the officers of the Advertising Corporation that while payment of the notes, because of the depression, would be slow they would be good.

The taxpayer deducted $15,518.52 from his 1933 income as a bad debt. The Commissioner disallowed the deduction, the Board confirmed its action and thereby determined a tax deficiency of $3,458.16 for 1933. The deduction of $7,476.91 allowed for 1932 exhausted the 1932 income so that there was no taxable income deficiency for that year. Board Member Disney said in his opinion that the taxpayer had ascertained his entire loss in 1932 and could not "place a part of it in the year 1933." He remarked that: "The question here is as to when the petitioner ascertained, or as a reasonable person should have ascertained, that these debts were worthless."

He added: "There is shown no distinction between the advertisers' notes forming the basis for the $15,518.52 loss claimed in 1933 and those constituting the basis of the $7,476.91 deducted for 1932 * * *; and the notes as to which claim is made for 1933 originated in the same territory covered by the advertising affected by the deduction for 1932. We think that he did in fact realize in 1932 that his loss had been sustained; certainly in that year he should reasonably have so realized. We therefore are of the opinion that the loss claimed for 1933 should be disallowed and approve the respondent's action in regard to that year, disapproving it, however, as to the year 1932."

■ Apparently the Board regarded the provisions of Section 23 (j) of the Revenue Act, 26 U.S.C.A. Int.Rev.Acts, page 357, allowing deductions of bad debts "ascertained to be worthless and charged off within the taxable year" as meaning that worthless debts in order to be deductible must be charged off whenever the taxpayer either "ascertained", "or as a reasonable person should have ascertained, that these debts were worthless". Such a rule would involve an objective and not a subjective test in respect to ascertainment by the taxpayer, while our recent decisions in Moore v. Commissioner, 2 Cir., 101 F.2d 704, and Herskovits v. Commissioner, 2 Cir., 110 F.2d 272, indicate that a bona fide ascertainment by the taxpayer of the worthlessness of a debt will justify a deduction irrespective of whether its worthlessness could have been ascertained prior to the year when it was discovered. But it seems manifest to us that when a taxpayer knows the worthlessness

of a debt in a certain year and yet chooses to indulge in hopes that something may still be realized from a claim that at the time has neither collectibility nor market value, he ought not to be allowed to delay taking his deduction until all his hopes or illusions are completely dispelled, for it had ceased to have a commercial value. While the test of ascertainment is a subjective one, and the taxpayer will not lose his right to deduct a worthless debt through a mere error of judgment, proof that in a particular year the facts known to him indicated the worthlessness of the debt and that it was then actually worthless seems to justify an inference that he then ascertained it to be worthless. Here the Commissioner disallowed the deduction of $15,518.52, stating in his "Explanation of Adjustments" for the year 1933 that his disallowance was "consistent with the adjustment made on similar notes in the year 1932". The taxpayer had the burden of showing that the Commissioner's assessment was wrong—a burden which we do not think was met by Mr. Schoenfeld's statement in his letter of September 15, 1932, that he would "endeavor to see what could be done with the list of notes you have given me", or his letter of December 20, 1933, to the effect that the collateral was worthless with the exception of notes aggregating $9,981.48 about which he did not purport to know anything beyond the fact that they were due from so called "up-state" New Yorkers. How he distinguished them from notes payable by advertisers in Poughkeepsie to the amount of $2,067.96 is not apparent. Yet he treated the latter as worthless and the former as of possible value in spite of the fact that apparently none of the notes in question have ever yielded anything after many years.

Moreover, in spite of the fact that Member Disney seems to have regarded the deduction of any of the notes after the year 1932 as precluded if "a reasonable person should have ascertained, that these debts were worthless", yet he said in his opinion: "We think that he did in fact realize in 1932 that his loss had been sustained." The mere continuance of an attempt to collect notes which had been long overdue and were not shown to have differed in surrounding circumstances from those ascertained to be worthless and charged off in 1932 seems to us insufficient to overcome the prima facie validity of the Commissioner's assessment, and the conclusion of the Board that the taxpayer "did in fact realize in 1932 that his loss had been sustained." We hold that the taxpayer ascertained the notes in question to have become worthless in 1932, or at any rate that he did not sustain the burden of showing that the Commissioner was wrong. Accordingly he was not entitled to obtain a deduction in any later year. Person Construction Company v. Commissioner, 7 Cir., 116 F.2d 94.

Order affirmed.