## SAN JOAQUIN BRICK CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 10007.

Circuit Court of Appeals, Ninth Circuit.

Aug. 8, 1942.

222

Lafayette J. Smallpage, of Stockton, Cal., for petitioner.

Samuel O. Clark, Jr., Asst. Atty. Gen., and J. Louis Monarch, Newton K. Fox, and Fred E. Youngman, Sp. Assts. to the Atty. Gen., for respondent.

Before WILBUR, STEPHENS, and HEALY, Circuit Judges.

STEPHENS, Circuit Judge.

Petition to review a decision of the Board of Tax Appeals which affirmed a determination of the Commissioner of Internal Revenue that the petitioner-taxpayer is not entitled to certain claimed deductions in computing its 1934 income taxes.

The matter was submitted to the Board of Tax Appeals upon a stipulation of facts, neither the petitioner nor the Commissioner introducing any other evidence.

The stipulated facts are, briefly, as follows:

The petitioner-taxpayer is a California corporation with its principal office at Stockton, California, and is engaged in the manufacture and sale of building materials. It keeps its books and prepared its income tax returns on an accrual basis. In 1934 and 1935, all shares of its capital stock were owned by I. R. Stein, who has since died.

Stockton Medico-Dental Building, Inc. [herein called Medico-Dental] is a Delaware corporation organized in 1925. It erected a twelve-story office building at Stockton and on June 15, 1926, issued $400,000 six and one-half percent first mortgage bonds and $110,000 seven percent second mortgage bonds, maturing serially up to June 15, 1942, secured by deeds of trust on the building.

Between 1926 and 1934, taxpayer acquired some of each class of these bonds. $30,000 second mortgage bonds were received by it for construction materials of that value supplied by it to Medico-Dental in the construction of the building. $10,000 of these second mortgage bonds were sold by taxpayer in 1927.

As of January 1, 1934, taxpayer owned second mortgage bonds of Medico-Dental which it had acquired on the dates, in the quantities and at the costs shown as follows [the $20,000 total of bonds shown to have been acquired in the years 1926 and 1927 represent the remainder of the $30,000 bonds acquired for construction materials to which we have just referred]:

| Date Acquired | Face Value | Cost. |
|---|---|---|
| Sept. 18, 1926 | $12,000.00 | $12,000.00 |
| Dec. 21, 1926 | 1,000.00 | 1,000.00 |
| Feb. 1, 1927 | 3,000.00 | 3,000.00 |
| Mar. 12, 1927 | 4,000.00 | 4,000.00 |
| Apr. 4, 1929 | 10,000.00 | 8,500.00 |
| Apr. 8, 1929 | 2,000.00 | 1,750.00 |
| Apr. 11, 1929 | 8,000.00 | 6,490.00 |
| Apr. 19, 1929 | 24,000.00 | 18,500.00 |
| Apr. 25, 1929 | 2,000.00 | 1,600.00 |
| Apr. 29, 1929 | 1,000.00 | 825.00 |
| May 1, 1929 | 4,000.00 | 3,200.00 |
| May 20, 1929 | 5,000.00 | 4,625.00 |
| Nov. 9, 1933 | 23,000.00 | 2,300.00 |
| Totals | $99,000.00 | $67,790.00 |

In 1929 Medico-Dental was in default on its obligations under the deeds of trust securing its first and second mortgage bonds. Thereupon Medico-Dental Investment Company, a California corporation [hereinafter

referred to as Investment Co.] was organized on March 11, 1929, to acquire and operate the building. The Investment Company assumed the first and second mortgage bonds, then outstanding in the amounts of $392,500 and $110,000 respectively, in consideration of a transfer of Medico-Dental property to it. Investment Company issued 615 shares of stock of $50.00 par value, of which 600 were issued to taxpayer for $30,000.00.

In 1930 Investment Company defaulted in payment of interest on the second mortgage bonds, and in 1933 it defaulted in payment of interest and sinking fund obligations on the first mortgage bonds. The first mortgage bondholders thereupon formed protective committees which formulated a reorganization plan, and on January 29, 1934, made an agreement with Investment Company and Medico-Dental to carry out the plan. This plan was submitted on June 5, 1934, to holders of first mortgage bonds.

The plan provided that if all first mortgage bonds should be deposited with a reorganization committee before August 1, 1934, the trust indenture of June 15, 1926, would be amended so that the six and one-half percent · first mortgage gold bonds would have the effect of "new bonds" and be returned to the parties entitled thereto and the plan of reorganization consummated. If all first mortgage bonds should not be deposited, Investment Company or a new company would acquire the mortgaged building at a trustee's sale under foreclosure and issue bonds to each depositor in the same principal amount as the bonds deposited. Such new bonds, dated June 15, 1933, and maturing June 15, 1947, would bear four percent interest, and (the company's earnings permitting) ad-

ditional interest up to one percent, and coupons for "deferred interest" aggregating three and one-quarter percent of principal and payable in four semi-annual installments ending December 15, 1935, from the promissory note to be given by taxpayer [1] to the new company.

To secure the new bonds, a deed of trust would be placed upon the building, requiring that the new company's net income be paid to a trustee for application to the bonds, and imposing other restrictions safeguarding the loan. The new company's capital stock would consist of 615 shares of which 600 would be placed in trust as additional security for the bonds, and after fulfillment of obligations under them, would be transferred to taxpayer. Taxpayer was also to pay Investment Company's accounts payable incurred prior to June 15, 1933, and acquire its accounts receivable as of that date, and pay the expenses of the reorganization plan, including the amount necessary for distribution to the non-depositing stockholders.

In considering this plan of reorganization it should be noted that it contemplated the possibility of having deposited 100% of the outstanding first mortgage bonds, in which event [quoting from the plan] "the Committee can accomplish the foregoing plan of reorganization without the trustee's sale and by merely amending the deed of trust securing said bonds and having the Trustee make appropriate notation on the bonds". Of course if this had been accomplished, the proposed modification of the interest rate and maturity dates on the first mortgage bonds would have been effected without any change in equity ownership or revision of debts junior to the first mortgage bonds.[2]

---

[1] The plan recites that this note is to be given by I. R. Stein, who, as we have stated, was taxpayer's sole stockholder. It is stipulated that all obligations entered into and all action taken by Stein under said agreement were entered into and taken by him as nominee of taxpayer.

[2] There appears in one of the exhibits on file a "Registration Statement" filed by the Investment Company with the Federal Trade Commission in connection with the reorganization some time subsequent to May 31, 1934, in which the statement is made "If the securities for which this Registration Statement is filed are ultimately issued, the Second Mortgage 7% Notes of Stockton Medico-Dental Building, Inc. will be retired either by

the voluntary surrender of said notes by the holders thereof for cancellation or by the foreclosure * * * of the deed of trust securing 6½% the First Mortgage Gold Bonds". This is the only place in the record where it is indicated that it might have been a part of the plan to retire the Second Mortgage Bonds by voluntary surrender, and this statement was apparently made by the Investment Company some four or five months after the plan was formulated. The plan as outlined in the stipulation of facts, and in the agreement which also outlines the plan both show that if 100% of the first mortgage bonds had been deposited, the reorganization would have been accomplished by merely amending the deed of

The full 100% of the outstanding first mortgage bonds were not deposited, and in accordance with the plan the bondholders' committee on November 16, 1934, caused Stockton Medico-Dental Building Company [hereinafter referred to as the "New Company"] to be organized as a corporation under the laws of California.

The Committee then transferred to the New Company in trust all the bonds which had been pledged to them [$336,700 out of a then outstanding issue of $351,000].

On November 20, 1934, the trustee under the trust indenture securing the first mortgage bonds took possession of the property pledged under the trust indenture, and on December 14, 1934, sold all the assets at public sale to the highest bidder, which was the New Company. The New Company then issued first mortgage notes to the depositors in the full face amount of their deposited bonds, with extended maturity dates bearing interest at four percent guaranteed and one percent additional, if earned. The non-depositing holders of first mortgage bonds received 30 cents on the dollar face value of their bonds.

The accounts payable of Investment Company incurred prior to June 15, 1933, and which taxpayer had assumed under the plan of reorganization as above outlined, amounted to $19,959.60. They were all due to taxpayer itself for merchandise, advances and interest. There was also a note to a bank for $5,000 payable with accrued interest on May 28, 1933, on which taxpayer was guarantor. Taxpayer paid on account of its liability on this note the sum of $5,010.32.

Investment Company's accounts receivable on June 15, 1933, which taxpayer received, amounted to $15,134.15, due from tenants of stores and offices in the building. Of this, it collected and paid to taxpayer $8,452.69 on November 9, 1934.

Taxpayer in 1934 charged off on account of this latter transaction the sum of $16,517.23, computed as follows:

| | |
|---|---|
| Accounts payable assumed | $19,959.60 |
| Note and interest paid | 5,010.32 |
| | $24,969.92 |
| Less amount collected on accounts receivable | 8,452.69 |
| | $16,517.23 |

Taxpayer claims that it is entitled to deductions in computing its 1934 income tax return in the following amounts:

(1) The cost price of the second mortgage bonds of Investment Company totaling $67,790.00.

(2) The cost price of shares of stock of investment company totaling $30,000.00.

(3) The $16,517.23 difference between the accounts payable and amounts received on accounts receivable as above set forth.

In connection with this latter claimed deduction the Board determined that only $9,835.77 was deductible. The $9,835.77 figure was arrived at as follows:

| | |
|---|---|
| Accounts payable assumed | $19,959.60 |
| Note and interest paid | 5,010.32 |
| | $24,969.92 |
| Less accounts receivable | 15,134.15 |
| | $ 9,835.77 |

For convenience we shall consider the three claimed deductions separately. We turn first to item (2), the $30,000 expended for stock of Investment Company.

### The Investment Company Stock.

The Board found as a fact that this stock became worthless before 1934, the year in which the taxpayer claimed his deduction. At the outset we are faced with the Commissioner's argument that this finding is binding on us if supported by evidence. Taxpayer, on the other hand, urges that since the case was submitted upon a stipulation of facts, "this Court has the power and the duty to examine those facts for the purpose of reviewing the reasonableness of the Board's conclusion". The point seems to be that the Board's conclusions from the stipulated facts are either mixed questions of law and fact or conclusions of law, which are subject to our independent judicial review. Commissioner v. Boeing, 9 Cir., 106 F.2d 305, 309.

In the Boeing case, supra, we analyzed recent cases decided by the Supreme Court on the power of this Court to review decisions of the Board of Tax Appeals. On the basis of Helvering v. Rankin, 295 U.S. 123, 131, 55 S.Ct. 732, 79 L.Ed. 1343, and Helvering v. Tex-Penn Co., 300 U.S. 481, 57 S.Ct. 569, 81 L.Ed. 755, we held that in the case then under consideration

---

trust securing the first mortgage bonds and making an appropriate notation on the bonds. It should be kept in mind that the agreement was arrived at by a committee representing only the first mortgage bondholders. This committee

the ultimate findings of the Board were "conclusions of law, or mixed questions of law and fact within the meaning of the Supreme Court rulings and as such are subject to independent judicial review by this court." [106 F.2d 309]. The ultimate finding of the Board with which we were there concerned was as to whether the taxpayer was engaged in a "trade or business" which is entirely different from the finding with which we are concerned in the instant case, namely, as to the value of the stock in question prior to the year 1934. The question as to the year in which stock becomes worthless would seem to be purely a question of fact, and if the stipulated facts support the Board's finding that it became worthless prior to the year 1934, it is our opinion that such finding is binding upon us.

■ But aside from all of that, the argument of both parties to this appeal on the question of the conclusiveness of the Board's finding discloses a misunderstanding of the expressions often made by the Courts that the Commissioner's determination is supported by a presumption of correctness and that the taxpayer has the burden of showing it to be wrong. See, for instance, Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212.

In Perry v. Commissioner, 9 Cir., 120 F.2d 123, 124, this Court undertook to explain such expressions by saying, "This finding [the determination of the Commissioner] is presumptively correct, that is, until the taxpayer proceeds with competent and relevant evidence to support his position, the determination of the Commissioner stands: When such evidence has been adduced the issue depends wholly upon the evidence so adduced and the evidence to be adduced by the Commissioner. The Commissioner cannot rely upon his determination as evidence of its correctness either directly or as affecting the burden of proof."

■ It has often been pointed out that in claiming tax deductions the taxpayer must show clearly that he comes within the statute allowing such deductions. But once he presents competent and relevant evidence on every necessary element, the presumption of correctness of the Commissioner's determination is no longer existent and the

outcome of the case depends upon the determination of the trial body after the consideration of the evidence brought before it by both sides. When the evidence on both sides has been adduced, and the Board makes its findings of fact, then the sole question presented to the Court, so far as the facts are concerned, is whether or not the Board's findings are supported by the evidence.

■ If the taxpayer fails to present substantial evidence on every point necessary to entitle him to the deductions claimed, this Court upon petition for review necessarily will hold against their allowance. In doing so we are not considering proof nor are we weighing the evidence.

With these principles in mind we turn to the claims of the taxpayer in the instant case.

■ The law is clear that as to claimed deductions for worthless stock the income tax law contemplates that the deduction must be taken in the year in which the loss is sustained by reason of the stock actually becoming worthless. The statute does not make the loss deduction dependent upon the time of ascertainment but rather upon the time when the loss is truly sustained. See Bartlett v. Commissioner, 4 Cir., 114 F.2d 634, 638, 639, and cases therein cited.

It is conceded by all that the stock of Investment Company was worthless at least after the sale of the property under foreclosure in 1934. But that is not the question. The problem for us to decide is—did taxpayer represent competent evidence tending to prove that the stock actually *became* worthless in 1934? If it did present evidence on this point, then we must consider whether or not evidence was introduced to support the Board's conclusion that the stock *became* worthless prior to the beginning of the year 1934.

■ This leads us to the question: What is necessary for a taxpayer to prove in order to establish the fact that stock which he holds became worthless in the year in which he is claiming a deduction?

It would appear, as pointed out by the Court in Dunbar v. Commissioner, 7 Cir., 119 F.2d 367, 369, 135 A.L.R. 1424, that "As a part of his burden in demonstrating that it became worthless in [the year of

---

could not make any agreement that would wipe out the rights of the holders of the second mortgage bonds without their

consent. There is nothing in the record to indicate that such consent was given by the holders of second mortgage bonds.

the claimed deduction] he must of necessity show that it had some intrinsic or potential value at the close of [the preceding year]."

The stipulation of facts upon which this case was presented to the Board of Tax Appeals is entirely silent on this matter. All that we are told is that in 1929 the Investment Company was organized and that there were transferred to it the properties of Medico-Dental. The value of these properties is not shown. No balance sheets of any kind are in the record. We know that the properties transferred to the Investment Company were mortgaged to the extent of some $500,000.00, being the total of the first and second mortgage bonds, and that there was a default on the second mortgage bonds in 1930 and on the first mortgage bonds in 1933, after which protective committees were organized to work out a plan of reorganization.

Certainly this all falls far short of evidence to show that the stock of Investment Company which the taxpayer claims to have become worthless in 1934 had any intrinsic or potential value at the close of 1933.

In this situation it is our duty to hold that there is no error in the Board's determination that the taxpayer is not entitled to claim a deduction for the worthlessness of the Investment Company stock in 1934.

### The Second Mortgage Bonds of Investment Company.

As to these bonds we have a different situation. Under Regulations 86 of the Treasury Department [Art. 23 (k) 4] it is provided that "Bonds, if ascertained to be worthless, may be treated as bad debts to the amount actually paid for them * * *".

And, as pointed out by the decision in Bartlett v. Commissioner, supra [114 F.2d 638], "the law applicable to deductions for worthless stock stands out in clear relief when it is viewed against the background of the law pertaining to deductions for bad debts".

Under the 1934 Revenue Act, c. 277, 48 Stat. 680, 26 U.S.C.A. Int.Rev.Code § 23, the bad debt deduction is set forth as follows: "Debts ascertained to be worthless and charged off within the taxable year * * *".

It is stipulated by the parties that the taxpayer charged off the purchase price of the bonds in the year 1934, but the dispute between the parties arises out of the question of whether they were "ascertained to be worthless" during that year.

We therefore examine the stipulation of facts to determine whether or not it can properly be said that taxpayer presented evidence on every essential element to the proving of its case.

Unlike the situation with respect to claiming a deduction for worthless stock, where we have heretofore held that a part of the taxpayer's case is to show that the stock had some intrinsic or potential value at the close of the preceding year, in the case of bad debts the actual worthlessness of the debt prior to the tax year in which the deduction is claimed is immaterial so long as the debt was "not ascertained to be worthless" by taxpayer prior to that time.

The taxpayer must present evidence, then, to show: (1) That the debt actually was uncollectible during the year in which he claims the deduction [this is clear in the instant case from the stipulated fact that the property was lost by foreclosure proceedings in 1934] and (2) that he actually "ascertained" that fact for the first time during the tax year in question.

On this second point we have the following stipulated facts: Taxpayer was fully aware of the reorganization proceedings and the foreclosure of the property [this shows that the "ascertainment" was at least as early as 1934 when it claims the deduction]; that until August 1, 1934 [the deadline for obtaining a deposit of 100% of the first mortgage bonds] the reorganization committee hoped to accomplish the plan of reorganization without a trustee's sale, thereby, as we have heretofore pointed out, effecting the reorganization without any change in equity ownership or revision of debts junior to the first mortgage bonds; that as late as November, 1933, taxpayer purchased and paid $2,300.00 for $23,000.00 face value of the second mortgage bonds.

It is our opinion and we therefore hold that there was sufficient evidence from which the Board could have found that the taxpayer "ascertained" the bonds to be worthless in 1934.

In this situation, then, the question for our determination is whether there was evidence on behalf of the Commissioner to sustain the Board's finding that the bonds were ascertained to be worthless prior to 1934.

■ The Board's finding in this respect is that the bonds "were in fact worthless before 1934, and the petitioner must be charged with having then ascertained it".

In order to support this finding, it is apparent that there must be evidence (1) that the bonds were in fact worthless before 1934 and (2) that the facts were such that taxpayer is charged with having ascertained the worthlessness of the bonds prior to that year.

■ There is some conflict in the cases as to just when a taxpayer is to be charged with ascertainment of the worthlessness of a debt. It is our opinion and we hold that the case of Rosenthal v. Helvering, 2 Cir., 124 F.2d 474, 476, correctly sets forth the true rule, as follows:

" 'Losses' must be deducted in the year in which they are 'sustained' and if the taxpayer fails to learn of them in time, he loses the privilege; debts, on the other hand, must be deducted in the year in which the taxpayer 'ascertains' them to be 'worthless,' and nobody understands that this imposes upon him the absolute risk of selecting the year when they actually became so. * * * However, beginning with Avery v. Commissioner, 5 Cir., 22 F.2d 6, 55 A.L.R. 1277, courts have at times charged taxpayers with the duty of selecting that year in which a prudent person with the same information would have concluded that the debt was uncollectible. * * * In Curry v. Commissioner, 2 Cir., 117 F.2d 307, 309, 310, we held, however, that the 'subjective test' as we called it, was the right one; that is, that the proper year was that in which the taxpayer did 'ascertain' the fact no matter how much earlier a reasonably prudent person would have done so. * * *

"The taxpayer's failure to 'ascertain' the uncollectibility of the debt as early as a prudent person would have done so, must not be actuated by a desire to postpone the deduction to a later year; he may as little choose the year of greatest advantage to himself by deliberately refusing to follow up evidence which will lead to the facts as by refusing to make use of facts themselves. That would be indeed what the Board here called 'shutting one's eyes to the facts.' But it is one thing not to permit a taxpayer to check an inquiry which he would otherwise have made, and another to impose upon him the duty of general vigilance * * *."

In other words, the taxpayer is under no duty of general vigilance to ascertain the fact of worthlessness of a debt. However, if the taxpayer does know the facts he cannot "shut his eyes" to those facts. The taxpayer's failure to "ascertain" the uncollectibility of the debt as early as a prudent person would have done so "must not be actuated by a desire to postpone the deduction to a later year". He cannot deliberately refuse to follow up evidence which will lead to the facts, nor can he refuse to make use of the facts themselves.

In the instant case, the taxpayer concededly knew all the facts. It was the principal stockholder and took an active part in the affairs of the company. It would seem, therefore, that if the evidence shows that the bonds were in fact worthless prior to 1934, as the Board found, it would be our duty to hold that that fact would be evidence that the taxpayer actually "ascertained" their worthlessness at that time.

At this point it is well to again point out that the Board did not find that taxpayer actually "ascertained" the worthlessness of the bonds prior to 1934, but that it was chargeable with notice of their worthlessness. It is our opinion that in the event we should find that there is evidence from which the Board could properly conclude that the taxpayer did actually "ascertain" the fact of worthlessness prior to 1934, then it would be our duty to remand the cause to the Board to find upon the point. On the other hand, if there is no evidence from which the Board could properly find an actual "ascertainment" of worthlessness by taxpayer, i. e., if there is no evidence to support a finding that a reasonably prudent person with knowledge of the facts would have "ascertained" that the bonds were worthless, then it is our duty to reverse the cause in favor of the taxpayer. And as we have just said, in the particular circumstances of this case the question turns on whether or not there is evidence to support the finding of the actual worthlessness of the bonds prior to 1934.

In urging that the Board's finding is supported by the evidence, the Commissioner relies upon the stipulated fact that there was no interest paid on the second mortgage bonds after 1930 and that there was a default in 1933 on the interest and sinking fund obligations on the first mortgage bonds. But this is not evidence that the bonds themselves were entirely *worthless*.

The Commissioner also relies on the fact that in 1933 bondholders' protective committees were organized and that these committees thereafter adopted and filed a plan of reorganization, not making therein [quoting from the Commissioner's brief] "any provision for holders of second mortgage bonds". There are two answers to this point made by the Commissioner. The first is that as we have pointed out above, under the plan it was contemplated that the reorganization might be accomplished without the necessity of foreclosure, in which event the second mortgage bonds would have remained legal evidences of indebtedness secured by the junior mortgage on the building. The second answer is that the evidence does not disclose that the reorganization plan was worked out in 1933 as is assumed by the Commissioner. The stipulated facts show that the protective committees were organized in 1933, and that these committees entered into an agreement on January 29, 1934 to carry out the plan which they had formulated, and which is set forth in the agreement. On such evidence we cannot sustain a finding that the details of the plan were worked out in the year 1933.

The Commissioner also urges that the finding as to the worthlessness of the bonds in 1933 is supported by the fact that in 1934 the property was foreclosed upon and bid in at public sale for $104,000, which provided for the dissenting first mortgage bondholders only 30¢ on the dollar. We do not agree that evidence of a sale on foreclosure in December, 1934, at a figure much below the amount of outstanding first mortgage bonds, furnishes support for a finding that as of the end of 1933 there was no equity or value behind the second mortgage bonds.

◼ In dealing with the question of the deduction claimed on account of the common stock of the Investment Company we pointed out that there was no evidence as to the worth of the company at the close of the year 1933. There is nothing in the record to indicate the value of the real property on which the first and second mortgage bonds were a lien. In other words, there is no evidence to support a finding that the second mortgage bonds were actually worthless prior to the time of the foreclosure proceedings in December, 1934, or at least prior to the time when it became apparent that the proposed plan of reorganization by obtaining a deposit of 100% of the outstanding first mortgage bonds would not be carried through. We therefore hold for the taxpayer on this point.

### The $16,517.23 Deduction.

As has heretofore been recited, under the reorganization proceedings taxpayer assumed the Investment Company's accounts payable incurred prior to June 15th, 1933, and received the accounts receivable of said company as of that date. In making its income tax return for the year in question, taxpayer claimed a deduction for the difference between the accounts payable and the amount which it had actually received from the accounts receivable, while the Board allowed a deduction of only the difference between the accounts payable and the gross accounts receivable. In arriving at this conclusion the Board in effect held that taxpayer was entitled to the deduction for the amounts which it assumed under the reorganization proceedings, but that there must be an offset for income received by it in the same transaction. We are not concerned in this appeal with the propriety of the Board's holding that the deduction was proper, but only with the holding that taxpayer is chargeable with income in the gross amount of the accounts receivable.

◼ In considering this question it is important to keep in mind that taxpayer kept its books and prepared its income tax returns on an accrual basis, and it is therefore clear that the Board was correct in charging taxpayer with income received by virtue of the assignment to it of the Investment Company's accounts receivable.

◼ But taxpayer urges that the accounts receivable over and above the $8,452.69 collected thereon were valueless, and were charged off by it during the tax year. But a charge-off is not enough to entitle a taxpayer to a deduction for worthless debts. It must be remembered that the debts here claimed as worthless were not those of the Investment Company, but rather of debtors of that company. There was no evidence presented as to the financial responsibility of these debtors or their ability to pay. In this state of the record it is our duty to hold that there was no error in the Board's refusal to allow the deduction.

This holding is not a holding [as is urged by taxpayer] that the accounts receivable were accepted by taxpayer as a payment pro tanto on the indebtedness which it assumed. Taxpayer, being on an accrual basis, is

chargeable with income received by virtue of the assignment to it of the accounts receivable. In the absence of a showing that the accounts receivable were "ascertained to be worthless" during the tax year, no deduction is allowable.

The decision of the Board in refusing to allow a deduction of the cost price of the second mortgage bonds of Investment Company totaling $67,790.00 is reversed. In all other respects, the decision is affirmed.

HEALY, Circuit Judge (dissenting).

I disagree with the holding insofar as it reverses the Board's order. The Board found on the evidence before it that the second mortgage bonds "were in fact worthless before 1934, and the petitioner must be charged with having then ascertained it." The facts, or inferences properly to be drawn from the facts, support the finding. Again, the Board found in a negative way that there was no sufficient proof that the bonds became worthless in 1934 or were ascertained to be worthless in that year. It is not our province, but that of the Board, to weigh the evidence and to draw the inferences.