Fred C. NIEDERKROME, E. Royce, Dora F. Royce, Ezra Royce, B. Royce, Estate of Isabelle H. Royce, Deceased, B. Royce, Executor, Robert T. Jacob, Agnes C. Jacob, Albert L. Schneider and Bertha Schneider, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 15724.

United States Court of Appeals Ninth Circuit.

Nov. 10, 1958.

Certiorari Denied March 23, 1959. See 79 S.Ct. 725.

---

Louis Eisenstein, Washington, D. C.,
Randall S. Jones, Portland, Or., Eber-

hard P. Deutsch, New Orleans, La., for petitioner.

Charles K. Rice, Asst. Atty. Gen., Helen A. Buckley, Melva M. Graney, Lee A. Jackson, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before HEALY, FEE and HAMLEY, Circuit Judges.

JAMES ALGER FEE, Circuit Judge.

This action for review of the determination of tax deficiencies involves several problems:

1. Did the distribution of earnings by a corporation in payment of a note and the simultaneous redemption of 350 shares of stock purchased with the proceeds of the note constitute a distribution equivalent to dividends?

2. Did the payment or disbursement of incidental expenses to the company making the loan furnish any evidence of the intention?

3. Did the Tax Court err in admitting the minutes of the corporation making the loan?

4. Was a $20,000.00 disbursement by a different corporation to its stockholder a loan or a dividend and taxable?

5. Was the finding that a wife was not a bona fide partner in two different partnerships correct?

6. Where a partner declared a trust for his minor daughter and appointed himself trustee for her, but treated the proceeds as if he were the owner did the "trust" prevent taxation of the whole as his interest?

### Oregon Motor Stages

Oregon Motor Stages was a corporation operating an intrastate bus line as a common carrier. The outstanding capital of this corporation consisted of 750 shares, which the stockholders at that time insisted should be purchased as a unit. E. Royce, B. Royce, Robert T. Jacob and Albert L. Schneider were advised all the stock was thus for sale and signified their willingness to purchase 400 shares at $1,000.00 per share. After various attempts to find purchasers for the balance, 350 shares, L. R. Bentson received the certificates for these shares. Before June 20, 1945, E. Royce made an application to American Business Credit Corporation, an Oregon corporation, for a loan of $350,000.00, which corporation transmitted this application to its parent company, American Business Credit Corporation of Delaware. The minutes of an executive committee meeting of the latter corporation regarding this matter were admitted by the court. The 750 shares were sold and purchased July 2, 1945. The persons first mentioned took 400 shares and Bentson the balance.

On the same day, ABC issued its check to L. R. Bentson and E. Royce for $350,-000.00, and these persons gave a note for the amount due on or before ninety days from date. Oregon ABC billed Oregon Motors for $4,315.07, servicing fee for financing the loan. The invoice was approved by E. Royce and was paid by Oregon Motors on July 19, 1945, and charged to its expense account. All certificates were turned over to Oregon ABC to secure the loan of $350,000.00. Bentson gave receipt for the stock of each of the other shareholders reciting "such stock being loaned to me to be pledged to American Business Credit Corporation as collateral to loan this day made to me for the purchase of Three Hundred Fifty (350) shares of the common capital stock of said company." On August 31, 1945, Bentson offered to Oregon Motors his 350 shares. Oregon Motors purchased this stock by check to Bentson for $350,000.00, which was endorsed to Oregon ABC in payment of the original loan. Oregon Motors debited surplus with $315,000.00 and capital stock with $350,000.00, and paid interest on the loan to Oregon ABC and the payment to expense.

The question is whether the stockholders other than Bentson received a dividend by this transaction.

■ The decision by the Tax Court of the issues upon this phase of the matter was effected by two errors of approach. First, that court held that the determination of the Commissioner was

evidence to be weighed against that produced by taxpayers. This is fundamental error. We have consistently held that determination by the Commissioner raises a presumption of correctness which disappears once evidence which would support a contrary finding has been adduced in the trial of a contested issue.[1] Second, the Tax Court admitted in evidence the purported minutes of a meeting of ABC Delaware executive committee and considered these binding upon taxpayers. There was no testimony that these were the minutes of that body. There was an affidavit dated April 25, 1955, stating that affiant, Stuart A. Wixson, is treasurer and assistant secretary of Crown Finance Company, Inc., formerly ABC Delaware and that three attached pages comprise a copy of the minutes of a meeting held June 20, 1945, by the executive committee of ABC Delaware. The Tax Court hears and decides cases under rules of evidence which apply in the District of Columbia.[2] It is obvious such an affidavit was not in itself admissible under these rules. Even if this document were admissible,

it laid no foundation for the introduction of the minutes of an executive committee of ABC Delaware as against taxpayers who were not present, even according to the purported minutes.[3] The whole recorded transaction was one between the parent corporation and its Oregon subsidiary. There was no proof that the record was made in the regular course of business.[4] No witness testified as to the authenticity.[5]

The purported minutes do refer to a loan of $350,000.00 which was eventually made by the subsidiary ABC Oregon, but the transaction had not been consummated when this supposed meeting was held and was only in the negotiation stage. It was never carried out in the form here outlined, since there was another party to the note, as the event proved.

The ultimate ground of claimed admissibility is 28 U.S.C.A. § 1732.[6] But this entry does not come within terms of the statute. There is here no "memorandum or record of any act, transaction, occurrence or event." This writing purports to be nothing but the record of a trans-

1. Lawrence v. Commissioner of Internal Revenue, 9 Cir., 143 F.2d 456; San Joaquin Brick Co. v. Commissioner of Interal Revenue, 9 Cir., 130 F.2d 220, 225.

2. Internal Revenue Code of 1939, § 1111, 26 U.S.C.A. § 1111; Internal Revenue Code of 1954, § 7453, 26 U.S.C.A. § 7453.

3. The records of a corporation "are not competent evidence against third persons to prove contracts with them, in the absence of proof that they knew and assented thereto." Oregon & C. R. Co. v. Grubissich, 9 Cir., 206 F. 577, 580. The expression "not necessary to decision" in the following case is pat: "Corporate books of account are not competent against a stranger merely because they are the books of the company whose dealings they purport to record." United States v. Finberg, 2 Cir., 140 F.2d 592, 596, 154 A.L.R. 272.

4. The case of Bruce v. McClure, 5 Cir., 220 F.2d 330, 335, contains the following quotation from 65 A.L.R.: "The general rule is that before the books of a corporation are admissible in evidence their authenticity must be shown. It must be

made to appear that they are the books of the corporation, that they have been kept as its records, and that the entries made therein were made by the proper acting officer for that purpose * * *."

5. There was a stipulation which established that the record was that of the parent company, that it was in appropriate custody and that it was a true record of the meeting which it purported to record, but this stipulation did not cure the other defects pointed out or make it competent, relevant or material against taxpayers. See Parish's Estate v. Commissioner of Internal Revenue, 7 Cir., 187 F.2d 390, 395–396.

6. " * * * any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, * * * shall be admissible as evidence of such act, transaction, * * * if made in the regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction * * * or within a reasonable time thereafter." 28 U.S.C.A. § 1732.

action between parent and subsidiary corporations. At best, it is an interoffice memorandum.[7] It was not the intention of the statute to permit the sewing circle chatter of secretaries about an office party, recorded in the regular course of business of the corporation itself, to bind outside parties as if the latter had made admissions. In any event, the taxpayers who are sought here to be charged were neither parties to the transaction purportedly recorded nor to the conversation set down. All prior negotiations to a written contract are merged therein, even between the parties. The exhibit was therefore entirely inadmissible from any viewpoint.

On account of these errors, the cause must be reversed and remanded to the Tax Court for reconsideration. There are questions of fact involved which that tribunal should determine without placing extra burdens on taxpayers. The supposed necessity of meeting and overcoming a presumption of correctness of the determination of the Commissioner was heavy. And it is difficult to explain how the taxpayers could avoid prejudice in attempting to overcome the contents of the purported minutes, which were pure hearsay as to all parties in this case. Judicial officers required to winnow the wheat of pertinent evidence from the chaff of extraneous circumstance should have attached no weight or importance to this exhibit.

But these errors seem to have deflected the Tax Court from the real question in the case. It seems to have been the rationale of that body that, if it were proved that Bentson was acting on the suggestion of the other stockholders and not as an independent investor, taxpayers are liable.

However, the questions which should be tried arise from the face of the statute and the regulations. This Court will not attempt to decide such questions, but will simply outline certain considerations which may have a bearing. The former stockholders of this corporation acquired all the financial benefit of this transaction. By the sale, they received the cash for which they could have been taxed if they had withdrawn the surplus in the form of a pro rata distribution. But, although these persons have received such profits, there is no method of taxing them under the statute.

Taxpayers were unwilling to purchase more than 400 shares of stock, and attempted to find purchasers for the remaining 350 shares. Taxpayers decided to have the corporation acquire these remaining shares. The selling group were willing to proceed in this way, as they still received the full financial benefit of the transaction. An agreement to carry this plan into effect had been drafted when Bentson decided to purchase. It is problematical as to who, if anyone, would have been liable for tax if this agreement had been carried out as planned.

If a single stockholder of the selling group had owned these 350 shares, he might have retained the block or sold it to a third person. There need be no speculation as to whether either the one who retained the stock or the purchaser from him would be liable for tax if the shares were thereafter retired by the corporation.

"A cancellation or redemption by a corporation of all the stock of a particular shareholder, so that the shareholder ceases to be interested in the affairs of the corporation, does not effect the distribution of a taxable dividend."[8] On its face, such was the transaction here. Oregon Motors redeemed the 350 shares of stock owned by Bentson. Undoubtedly, if he had had no connection with the purchasing group, there would have been no tax upon anyone.

**7.** Standard Oil Company of California v. Moore, 9 Cir., 251 F.2d 188, 212–217, certiorari denied 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148.

**8.** Internal Revenue Code of 1939, as amended, Regulations 118, § 39.115(g) (1), (a) (2).

The Tax Court addressed itself, on account of the erroneous approach above pointed out, to a hypothetical demonstration of collusion between Bentson and the other stockholders of the purchasing group.

The real question is whether the taxpayers received any financial or economic benefits as a result of the redemption of the stock of Bentson. Upon this question the Tax Court made no findings. The proposition contains questions of fact. Until findings are made, the conclusions of law cannot be stated.

It can be argued that taxpayers got full control of the corporation. But should this circumstance, standing alone, be considered an economic or financial advantage? It may be considered whether the fact that, by payment of the note, the stock of each of the remaining taxpayers was released from pledge or lien gave them a pertinent advantage. Balancing this is the consideration that the stock redeemed was worth the amount of the note without interest. The payment of the interest by the corporation probably represents some loss to each taxpayer.

It may be said that the corporation must be differentiated from its stockholders. If the corporation owned $400,000.00 worth of assets and a surplus not necessary for its business of $350,000.00, which could have been paid out in dividends, then, by the sale for $750,000.00, the new stockholders acquired all this property. When the corporation paid out the surplus over that required by its business necessities, someone got a dividend. Therefore, it is said the taxpayers received value by the distribution. It seems this argument probably loses sight of its first postulate. It would not be the corporation which was sold, but the stock.

It must be considered then what economic or financial benefit taxpayers received, if any. The stock which they individually purchased was apparently not increased in value by the redemption. In fact, the corporation made incidental payments on this loan amounting to $8,054.80, which consisted of a service fee and interest. If these are obligations of Bentson, as they purport to be, how does their satisfaction constitute a dividend to the other stockholders? But, even if the payment of this fee and interest by the corporation impels the conclusion that these incidental expenses, and therefore the loan itself, were in reality the personal obligation of the remaining stockholders, would not these expenses, incident to a loan, be deductible by these stockholders as such? The question is raised whether the payment of such incidental expenses furnished evidence of an intention of the taxpayers. Here the doubt of the relevance of such intention is pertinent. The real question may well be whether there could be a dividend under the circumstances.

It is apparently held recently that there must be some real financial or economic value to the remaining stockholders in the redemption of the holdings of another before a tax is due from the former. Holsey v. Commissioner, 3 Cir., 258 F.2d 865.[9] Schmitt v. Commissioner, 3 Cir., 208 F.2d 819. It is true the case of Zipp v. Commissioner, 6 Cir., 259 F.2d 119, held that, where a majority stockholder sells his stock to minority stockholders, who use corporate funds to pay therefor, the sum paid is taxable as a dividend to those who purchase. However, in the case at bar, the taxpayers did not buy or agree to buy the stock. The Zipp holding has been severely criticized. And it has been said that, if there had been no sale to stockholders, a dividend determination could have been avoided by the remaining stockholders.[10]

The shares of stock in this corporation apparently became immensely more valuable in the hands of the selling stockholders. However, when they sold, they

---

**9.** This decision is discussed in 4 Roehner on Federal Taxation, par. 8, September 26, 1958.

**10.** 3 Roehner on Federal Taxation, paragraphs 127 and 131, June 13, 1958.

were subject to tax on whatever profit they realized thereon. During the years when this surplus was accumulated, the corporation itself was subject to income tax. Some fact must be found which justifies subjecting taxpayers to a further imposition.

The Tax Court concluded this transaction was not carried on at arm's length. But that formula is deceptive. The statute sets up no such test unless it results in an actual receipt of money or a constructive receipt of financial or economic advantage.

However, this Court will not usurp the function of the Tax Court. That tribunal should find the facts. The cause is remanded, however, because of the errors of law above noted.

### Hippodrome Amusement Company

The question whether E. Royce received a dividend from Hippodrome Amusement Company as a simple one.

■ Royce was one of four shareholders therein. He owned 218 shares, constituting about 61 per cent of the stock in 1945. On December 28 of that year, he received $20,000.00 from the corporation, which was carried on the books of the corporation as a loan. He had not repaid this amount at date of hearing. No note or other evidence of indebtedness had been executed nor interest paid. The government does not contend that this entry in the corporate books is conclusive. Neither B. Royce, brother of E. Royce, who owned 111 shares, nor Stephen Bartel, who owned 5 shares, received dividends. Niederkrome, brother-in-law of E. Royce, who owned 19 shares, received $400.00 in 1948, under circumstances similar to those under which E. Royce received $20,000.00.

The Tax Court held this disbursement was a dividend. As a question of fact, this Court accepts the judgment. If the question be viewed as one of law, we affirm this decision. The evidence need not be reviewed, since there was sufficient to support the finding.

### Yellow Cab of Oregon

Dora Royce was the wife of E. Royce. On July 31, 1942, Royce transferred to her 14,000 shares, slightly less than half of the stock he owned, in Yellow Cab Incorporated, an Oregon corporation. In August, 1942, the corporation was dissolved, and a partnership was organized where each partner kept the same percentage of ownership as had been represented by stock in the former corporation. The evidence shows that the company was actually managed by E. Royce. It is true, owing to numerous other activities, he only spent about half of his time there.

Dora Royce regularly acted for the partnership as a checker. She checked the conduct of the drivers, the appearance of their uniforms, the condition of the cabs and the number of passengers carried. She checked at hotels, stands, depots and other places where cabs regularly picked up or discharged passengers. Her observations were recorded in reports which she filed at the office. The hours devoted by Dora to her checking varied. Often she would work all day. On other occasions she would work less. At times she did checking in the evening. She was experienced in her work because she had performed the same services for the prior corporation. Now and then E. Royce did some checking. In the absence of Dora's services, the partnership would have had to employ a checker to do the checking. Dora also attended conferences of the partners and expressed her views.

■ The Tax Court affirmed the determination of the Commissioner that Dora was not a bona fide partner in this business. This finding is correct and will not be disturbed. The activities of Dora were such that any wife who had the interests of her husband's business at heart might perform. It must be remembered that by law she had a one-half interest in the proceeds. Her expendi-

tures were for family purposes. Besides, she "loaned" a great part of the earnings of this business, ostensibly allocated to her, to her husband to invest in another venture.

The determination of the Tax Court on this item was correct.

### Yellow Cab of Seattle

■ The Yellow Cab Company of Seattle, a Washington corporation, presents a situation parallel to that of the Yellow Cab Company of Oregon, and reinforces the finding there. Dora acquired a capital interest in Yellow Cab of Seattle through a gift made by her husband, E. Royce, on April 20, 1944. As was the Oregon corporation, the Washington corporation was dissolved and a partnership formed simultaneously on May 1, 1944. The firm consisted of ten members. The interest of Dora was about 7 per cent and that of E. Royce about 5 per cent of the total after the gift. Neither of the two was active in the business. Another partner was in direct charge of the enterprise and performed all the duties of management. On the same day as the gift to his wife, April 20, 1944, E. Royce declared himself trustee of about 13 per cent of the total stock for his minor daughter, Eunice, who was living at his home at the time and continued so until she went to the University of Oregon in 1947. She was in school until 1951, and was married in 1952. E. Royce drew $186,046.21 out of the earnings of the trust from January 1, 1944, to December 31, 1949, leaving a balance of $19,108.73 in the account. The withdrawals were spent for the following purposes:

| | |
|---|---:|
| Payment of federal and state taxes | $ 89,464.96 |
| Purchase of government bonds | 281.25 |
| Payment of personal expenses of Eunice Royce | 2,200.00 |
| Loans to or for E. Royce | 94,100.00 |
| Balance left in account | 19,108.73 |
| Total | $205,154.94 |

The loans to E. Royce totaled $87,000.00 and have never been repaid. All are now evidenced by three renewal notes bearing 3 per cent interest. Eunice M. Royce had no interest in the partnership. The funds were those of her father, who was obligated to support her. She performed no services for the partnership during these years. So far as the record shows, she was never in Seattle.

The Tax Court held that Dora Royce was not a bona fide partner in the Seattle Yellow Cab Company. It was also held that the so-called "trust" for Eunice was invalid for tax purposes, since its object was to siphon off income for the benefit of E. Royce. Both these findings were factually and legally correct. There was substantial evidence to support each.

Affirmed in part and remanded in part.