James H. Seagraves and Betty L. Seagraves v. Commissioner.
Seagraves v. Commissioner
Docket No. 71909.
United States Tax Court
T.C. Memo 1961-7; 1961 Tax Ct. Memo LEXIS 337; 20 T.C.M. (CCH) 34; T.C.M. (RIA) 61007; January 23, 1961
*337 Petitioners' books and records were not adequate to reflect correctly the income of their small rural grocery business, and respondent was justified in reconstructing gross sales by the percentage markup method. However, percentage used by respondent was found to be too high and his determination excessive and invalid. Gross sales of business redetermined by Court. S. B. Wallace, Esq., and Howard P. Wallace, Esq., for the petitioners. Sanford P. Keziah, Esq., for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined deficiencies in petitioners' income tax for the years 1954 and 1955 in the amounts of $440.29 and $198.29, respectively, and an addition to tax under section 294(d)(1)(A), I.R.C. 1939, for the year 1954 in the amount of $6.77. *338 The only issue for our determination is the correct gross sales of petitioners' grocery store business for the years 1954 and 1955. Findings of Fact Some of the facts were stipulated and are so found. Petitioners were married and lived on Route 1, Fayetteville, Georgia, during the years 1954 and 1955. They filed joint Federal income tax returns for the years 1954 and 1955 with the district director of internal revenue, Atlanta, Georgia. During the years 1954 and 1955 petitioners owned and operated a small grocery store located in a rural area of Fayette County, Georgia. They lived in the same building that housed the store. The store was operated primarily by Betty Seagraves. James Seagraves was a full-time employee of the Ford Motor Company during these years. Incorporated in their 1954 and 1955 income tax returns filed by petitioners was a schedule entitled "Profit (or Loss) from Business or Profession" which disclosed the following information with regard to petitioners' grocery store business for the respective years: 1954
Total receipts
$8,684.00
Beginning inventory
$ 1,980.00
Purchases
$9,263.59
Cost of labor
25.00
Material and supplies
40.00
Other costs
287.67
Cost of goods purchased
9,616.26
$11,596.26
Ending inventory
2,157.34
Cost of goods sold
9,438.92
Gross profit (or loss)
($ 754.92)
Other business deductions
50.75
Net profit (or loss)
($ 805.67)
1955
Total receipts
$7,422.00
Beginning inventory
$ 2,157.34
Purchases
$6,700.07
Cost of labor
100.00
Material and supplies
35.00
Other costs
255.79
Cost of goods purchased
7,090.86
$ 9,248.20
Ending inventory
2,216.00
Cost of goods sold
7,032.20
Gross profit
$ 389.80
Other business deductions
40.75
Net profit
$ 349.05
*339 The explanation of the item "Other costs" on the 1954 return indicated $195.25 for utilities, $10 for loss on bottles, $12.95 for advertising, and $69.47 for painting the store. The explanation of that item on the 1955 return indicated $233.24 for utilities, $12.95 for advertising, and $9.60 for loss on bottles. The item "Other Business Deductions" for both years consisted solely of depreciation. Betty kept the only books of the grocery business, which consisted of a plain notebook for each of the years 1954 and 1955, a double page of which was used for each month and was ruled off into squares, each square representing a day of the month. Betty recorded the purchases at the top of each square as they were made. At the end of each day Betty removed and counted the money in the money drawer maintained in the store, except for small change, and entered the total thereof in even dollar amounts at the bottom of the square for that day as sales. The store had no cash register and no sales slips or other underlying records to support or check sales. Some purchase invoices were retained which supported the purchases recorded to some extent. At the end of each month Betty totaled the daily *340 sales, usually on an adding machine the tape from which was stapled to the pages for that month in the notebook, and this total was used in filling out the Georgia monthly consumer's sales tax reports filed each month. The sales reported on these monthly reports agreed substantially with the daily sales recorded in the notebooks. A revenue agent making a routine audit of petitioners' returns for the years 1954 and 1955 in the late spring of 1957 was unable to reconcile the grocery store sales reported on the tax returns with the daily sales recorded in the notebook or with any other records maintained by petitioners. In both years the sales reported on the income tax returns exceeded the total of the daily sales recorded in the notebook; in 1954 the total recorded in the book being $7,984 and sales reported on the return being $8,684; in 1955 the total recorded in the book being $5,381 and sales reported on the return being $7,422. No explanation was given for the discrepancy. The revenue agent was able to reconcile fairly accurately the purchases recorded in the notebooks and reported on the returns, and he accepted the purchase figures as reported. In order to reconstruct sales *341 the revenue agent compared the purchase prices of about 45 separate items sold in the store, taken from 1954 and 1955 invoices, with the sales prices of those items as marked thereon on the store shelves in 1957. About half of the items checked consisted of meats and the remainder included canned and bottled foods and some bulk goods; however, very few large items appeared on the list. The average markup of the items checked in this manner was found to be approximately 26 per cent. Having been told by Betty that she attempted to maintain a markup of about 20 per cent on canned goods, the revenue agent adopted an average markup of 20 per cent in reconstructing sales. Accepting the purchase figures, as reported, and the opening and closing inventory figures, which Betty testified were by actual count, the agent added the opening inventory to purchases and subtracted the closing inventory therefrom to obtain the cost of merchandise sold for each year. He multiplied the cost of merchandise sold by 120 per cent, to reflect a 20 per cent markup, and determined the resulting figures to be the gross sales for each year, being $10,903 for 1954 and $7,969 for 1955. He allowed all of the deductions *342 claimed on the returns in arriving at net profit from the business. Using the net profit as so reconstructed for income from the business, and making one other adjustment not here in issue, respondent determined the deficiencies here involved. Betty sold some items of merchandise for considerably less than 20 per cent above cost, particularly items sold in bulk. Some of the larger items sold had a markup of less than 10 per cent. Petitioners suffered losses on merchandise spoiled and stolen which were not specifically claimed as deductions in computing net income from the grocery business. Petitioners terminated their grocery business near the end of 1957, partially because of Betty's ill health and partially because James refused to put any more funds into the operation of the store. The method of accounting regularly used by petitioners to compute the net profit or loss of their grocery store business for the years 1954 and 1955 was incomplete, inadequate, and inaccurate, and did not clearly reflect the income therefrom. However, respondent's determination of gross sales was excessive and invalid. Petitioners' gross sales in their grocery business were $10,450 in 1954 and $7,650 *343 in 1955. Opinion It is obvious that petitioners' books and records were inadequate to meet the requirements of section 1.446-1(a)(4), Income Tax Regs., which requires a taxpayer to keep such records and data as may be necessary to support the entries on his books and returns, and to reconcile any differences that may appear therein. While a taxpayer operating a small rural grocery store may not be expected to keep an elaborate set of books of account, he or she should keep sufficient records that can be demonstrated to correctly reflect the income of the business. Such was not the case with the records maintained by Betty. There were no supporting records to check sales. Sales were not recorded as made. The daily record of sales made by Betty was no more than a count of the money in the cash drawer at the end of the day, and while it would appear from Betty's testimony that at least some purchases were made with money taken from the cash drawer, there is no evidence that this was taken into account in recording daily sales. Gross sales reported on petitioners' income tax returns were not the same as those recorded on the books and no explanation was given *344 as to how the sales reported on the tax returns were computed. Purchases reported for both years exceeded gross sales recorded on petitioners' books, with no resulting increase in ending inventories, which remained relatively constant. Under the circumstances, respondent was entirely justified in reconstructing income or sales by the percentage-of-markup method. Burka v. Commissioner, 179 F. 2d 483 (C.A. 4, 1950), affirming a Memorandum Opinion of this Court; Bernstein v. Commissioner, 267 F. 2d 879 (C.A. 5, 1959), affirming a Memorandum Opinion of this Court; Anthony E. Spitaleri, 32 T.C. 988; M. Cohen, 5 B.T.A. 240. Respondent's reconstruction of net income is presumptively correct and the burden of proof is on petitioners to prove respondent's determination is invalid. Helvering v. Taylor, 293 U.S. 507; Rule 32, Rules of Practice of the Tax Court of the United States. However, where the evidence shows that respondent's determination is arbitrary or excessive it will be held to be invalid and any presumption attaching thereto disappears. Helvering v. Taylor, supra; San Joaquin Brick Co. v. Commissioner, 130 F. 2d 220 *345 (C.A. 9, 1942); Algernon Blair, Inc, 29 T.C. 1205. We think such is the case here. The evidence shows that respondent's agent computed the percentage of markup he applied to cost of merchandise sold to arrive at gross sales by comparing 1954 and 1955 purchase prices with 1957 selling prices, without giving any consideration to possible increase in prices in the intervening years. It is true that he used a lower percentage of markup (20 per cent) than the average he obtained by the above comparison (26 per cent) but this was because Betty had told him she tried to make a 20 per cent markup on canned goods. However, Betty testified that her markup on larger items was below 10 per cent and this was not taken into consideration by the agent. In addition, the agent gave no consideration to spoilage and theft, which he admitted would occur in most operations of this sort, or to losses on uncollectible accounts. Respondent argues that the agent allowed all the deductions claimed on the return, which should have included any such losses. But the fact is no such losses were claimed on the return. Spoilage and pilferage losses might be reflected in net income anyway if an accurate *346 ending physical inventory is used, but respondent's method of reconstructing sales here would include in sales 120 per cent of the cost of items which were never sold. Respondent took none of the above factors into consideration in reconstructing sales except as they might be reflected in the overall reduction of the percentage of markup from the 26 per cent indicated by the spot check and the 20 per cent markup actually used. Under the circumstances, we think respondent's percentage of markup was too high and that his determination of net income was excessive. Having found that petitioners' books did not correctly reflect their income from the determination thereof was excessive and invalid, it is our understanding from Helvering v. Taylor, supra, that we should determine the approximate amount of petitioners' net income as best we can from the evidence before us and without the benefit of any presumptions. Based on the evidence related above, our belief from observing Betty on the witness stand that she was truthfully trying to relate the facts as she knew them, the fact that this business was a small rural store with few customers that was not profitable enough *347 to continue operating when Betty became ill, and all other evidence before us, we are of the opinion that a markup of 15 per cent over the cost of merchandise as computed by the revenue agent would more nearly reflect the correct gross sales of the business during the years 1954 and 1955; and using approximately that markup we have found as a fact that petitioners gross sales for the years 1954 and 1955 were $10,450 and $7,650, respectively. Respondent's determination is approved in all other respects. Decision will be entered under Rule 50.