**PARAMOUNT LIQUOR COMPANY,**
**Petitioner,**

**v.**

**COMMISSIONER OF INTERNAL**
**REVENUE, Respondent.**

**No. 15435.**

United States Court of Appeals
Eighth Circuit.

March 14, 1957.

**250**

E. Chas. Eichenbaum, Little Rock, Ark. (Leonard L. Scott and W. S. Miller,

Jr., Little Rock, Ark., were with him on the brief), for petitioner.

Louise Foster, Atty., Dept. of Justice, Washington, D. C. (H. Brian Holland, Asst. Atty. Gen., and Lee A. Jackson, Robert N. Anderson and Carolyn R. Just, Attys., Dept. of Justice, Washington, D. C., were on the brief), for respondent.

Before STONE, JOHNSEN, and VOGEL, Circuit Judges.

STONE, Circuit Judge.

This is a petition to review a decision of the Tax Court denying a requested redetermination of an asserted deficiency in income tax for the calendar year 1949. The deficiency is concerned with one matter only—the disallowance by the Commissioner of an addition of $9,232.75 to taxpayer's bad debts reserve for 1949.

█ With additional allowable exemptions, a basic theory of the income tax law is to measure the tax by the net income of the taxpayer. "Bad debts" are obviously an element in determination of this net income in ascertainment of when a credit obligation can reasonably be treated as unrealizable (in whole or in part). Such debts were recognized by the statutes as properly allowable deductions from annual gross income; and statutory provisions prescribe the conditions of allowance.

In 1921, 42 Stat. 227, Sec. 234, Congress enacted an additional permissible method of handling bad debts. This was by the establishment of a reserve therefor. The reserve provision is dominated by two features: The right of the taxpayer to set up and annually add to such reserve; and the power of the Commissioner to keep the amount of additions to such reserve within reasonable limits.[1]

1. The statute involved is Internal Revenue Code 1939, Sec. 23(k) as amended in Revenue Act 1943, 58 Stat. 21, 26 U.S. C.A. § 23(k), which is as follows:
"§ 23. Deductions from gross incomes.
"In computing net income there shall be allowed as deductions:
\* \* \* \* \*

"(k) [As amended by Sec. 113(a), Revenue Act of 1943, c. 63, 58 Stat. 21]
*Bad debts.*
"(1) *General rule.* Debts which become worthless within the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debt; and when satisfied that a

■ Considering the purpose and method of the Statute, its operation involves an estimate by the taxpayer based upon his experience in the business as well as his knowledge of more general current situations which might react upon the credit situation in his business. Such estimates are within the educated discretion of the taxpayer subject only to the outer boundary control of the Commissioner as to reasonableness. Determination of this "reasonableness" is expressly lodged in the "discretion" of the Commissioner.

The broad issue here is factual and is whether the determination of this deficiency by the Tax Court is an unreasonable exercise of its statutory-given discretionary control. It is attacked by petitioner along two lines: (1) That "the Court failed to find or consider various facts"; and (2) the insufficiency of the evidence to support the determination. In support of its first contention, petitioner relies upon nineteen separate matters stated in its petition here.[2] The character of these two general issues coupled to the multiplicity of detail presented in the "failure to find" issue, compel a rather extended examination of the evidence.

### 1. *The Evidence.*

Examination of the evidence will mostly follow the general arrangement of matters which affected the wholesale liquor business and then matters of individual practice and methods of petitioner connected with credit sales to its customers. Petitioner is a Missouri corporation doing a wholesale liquor business in that State since 1934. It seems to have rather limited its territory to the city of St. Louis.

The evidence reveals no general conditions affecting the credit situation of business in general—including the wholesale liquor business. There were some general matters which particularly attached to the credit situation in the wholesale liquor business in Missouri. One of these was a regulation of the Missouri Liquor Commission which forbade sale of liquor by a wholesaler to any of its customers who were thirty days in arrears, until he paid up.

Another was an established custom governing sales of "brand" liquor—meaning brands which were widely advertised and therefore called for by the public. This custom was not to sell such brands to delinquent or slow-payment

debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction."

The pertinent Treasury Regulation promulgated thereunder is No. 111 as follows:

"Sec. 29.23(k)–5. *Reserve for Bad Debts.*—Taxpayers who have established the reserve method of treating bad debts and maintained proper reserve accounts for bad debts, or who, in accordance with section 29.23(k)–1, adopt the reserve method of treating bad debts, may deduct from gross income a reasonable addition to a reserve for bad debts in lieu of a deduction for specific bad debt items.

What constitutes a reasonable addition to a reserve for bad debts must be determined in the light of facts, and will vary as between classes of business and with conditions of business prosperity. It will depend primarily upon the total amount of debts outstanding as of the close of the taxable year, those arising currently as well as those arising in prior taxable years, and the total amount of the existing reserve. In case subsequent realizations upon outstanding debts prove to be more or less than estimated at the time of the creation of the existing reserve, the amount of the excess or inadequacy in the existing reserve should be reflected in the determination of the reasonable addition necessary in the taxable year. A taxpayer using the reserve method should make a statement in his return showing the volume of his charge sales (or other business transactions) for the year and the percentage of the reserve to such amount, the total amount of notes and accounts receivable at the beginning and close of the taxable year, and the amount of the debts which have become wholly or partially worthless and have been charged against the reserve account."

2. These are set forth hereinafter.

wholesale customers.[3] Petitioner has a full line of many brands.

Yet another such matter comprehended the effects of a governmental directive withdrawing, and later releasing, the use of grain for whiskey distilling. This directive was in force from October 1942 until June 1946.[4] The effects of this situation were, in outline, as follows. The distillers were allowed to continue manufacture of alcohol. This was mixed—"blended"—with such straight whiskey as they had or could procure.[5] Straight whiskey practically disappeared from the market and wholesalers were rationed on purchases of blended whiskey during 1946, 1947 and 1948. This scarcity and rationing affected the credit situation favorably and accounts due wholesalers were more promptly and more fully paid, until late in 1947 or early 1948 when the distillers began raising the allocations, having found out the restrictions on them were going to be removed. When the restrictions on whiskey distilling were removed (June, 1946), the favorable credit situation began reversing. Anticipating the return of straight whiskey in 1950, retailers disposed of any surplus stocks of blended whiskey and collections slowed down and became more difficult. In 1949, straight whiskey began flowing back into the trade. Competition between wholesalers grew keener and credit restrictions were slackened and new retail credit customers increased.

Another of these matters affecting the credit situation is the fact that almost anyone could get a retailer's license and there was no reliable information particularly available to check on a retailer's credit.

Now we pass from these matters generally affecting credit situations in the wholesale liquor sales to retailers to the business methods and practices of the petitioner. As stated above, Schenley was distilling and not wholesaling whiskey, so it made no great effort to increase the business of petitioner while it controlled the corporate stock of petitioner. When this stock was purchased from Schenley by the present owners on May 1, 1947, petitioners had only about five hundred accounts on its books although there were between twenty-four hundred and twenty-five hundred such accounts in St. Louis. Shortly, it added about four hundred or five hundred new accounts. In 1949, petitioner liberalized credit to meet the then competitive condition (described hereinbefore), and added about four hundred fifty new accounts. Its customers may be roughly classified as chain stores, hotels and separate retail dealers. The chain stores are reasonably prompt payers and good credit risks. As compared to sole proprietors, the chain stores, percentage-wise and in amounts, showed as follows: 25% or about $641,000 in 1947; 23% or $732,000 in 1948; 19% or $517,000 in 1949; 23% or $837,000 in 1951[6]; 36% or $1,480,000 in 1952.

As to sole proprietor retailers, the credit situation was different. There being no recognized central source of credit information, petitioner relied, in practically all instances, upon the recom-

---

3. As to one of the largest distillers, Schenley, the evidence is definite that no wholesaler handling Schenley would sell those brands to any retailer in default to any other wholesaler of Schenley brands. How far a similar boycott was applied by other distillers to their brands is not clear.

4. The directive was partially relaxed for the month of August 1945, to permit distilling from wheat, rye or other grain except corn. No whiskey was distilled during that August, but only alcohol spirits which were used in the blends as before.

5. Schenley bought the corporate stock of petitioner in order to acquire twenty thousand barrels of whiskey which petitioner owned. Schenley was distilling and apparently had no intention of remaining in the wholesale branch of the liquor business permanently. While owned by Schenley, the business of petitioner was continued under the same conditions as affected other wholesalers. May 1, 1947, the present stockholders bought the corporate stock from Schenley.

6. This data for 1950 does not appear in the record.

mendations of its salesmen in taking new accounts. Salesmen would visit the prospect "to see what the man has by way of property and his personal evaluation of the man's character." Rarely is there exchange of information among wholesalers. "Knowledge of an account comes some six or eight months when it is seen how he paid his bills."

Petitioner was very liberal in extending credit and "extremely conservative" in charging off accounts as bad debts.[7]

The bad debts reserve set up by the predecessors of petitioner was based on 5% of "accounts receivable". Petitioner set up its reserve on the basis of .4 of 1% of the "charge sales". The accountant for petitioner based its percentage reserve on his experience with other wholesale dealers over a period of years.

This basis amounted to approximately 5% of petitioner's accounts receivable. Five tabulations based on the books of petitioner were introduced—one by stipulation and the others by the Commissioner. Taken together, they revealed the classes of items as follows: Amount of "credit sales" (1947–49, inclusive)[8]; "accounts receivable" (1946–52, inclusive); bad debts charged to reserve" (1946–52, inclusive); "additions to reserve" (1942–52, inclusive); "reserve balance end of year" (1942–52, inclusive)—meaning balance after addition to reserve by petitioner. By adding to exhibit F table the "credit sales" (1947–49, inclusive) and the "bad debts recovered" (1946–52 inclusive) we will have all of this character of data useful here. This altered table is as follows:

| Year Ended | Credit Sales | Year Ending Accounts Receivable | Bad Debts Charged to Reserve | Bad Debts Recovered | Addition to Reserve | Reserve Balance End of Year |
|---|---|---|---|---|---|---|
| 12–31–46 | $ | $123,633.32 | $1,034.79 | $350.00 | $1,034.79 | $ 1,234.79 |
| 12–31–47 | 1,707,014.34 | 291,922.26 | 1,861.33 | ..... | 7,454.60 | 6,828.06 |
| 12–31–48 | 2,484,779.15 | 320,812.49 | 1,287.14 | 65.73 | 9,939.12 | 15,480.04 |
| 12–31–49 | 2,308,186.90 | 365,094.90 | 6,579.86 | 241.69 | 9,232.75 | 18,374.62 |
| 12–31–50 | | 779,156.42 | 5,957.95 | 381.50 | 5,957.95 | 18,374.62 |
| 12–31–51 | | 484,952.14 | 2,974.40 | 813.95 | 8,038.50 | 23,438.92 |
| 12–31–52 | | 641,285.55 | 4,836.79 | 427.90 | 8,553.35 | 27,583.58 |

The foregoing summary outlines sufficiently the evidence although reference to other details may be made in connection with some of the specific items urged by petitioner.

### 2. *Matters Urged by Petitioner.*

As earlier stated herein, petitioner attacks the determination of the Tax Court along two lines: (1) Failure to find or consider nineteen specifically set forth items; and (2) failure to find generally that petitioner's proposed additions to its bad debt reserve for 1949 was reasonable.

*The Specific Items.* As pleaded in the petition, these nineteen items are set

---

**7.** The accountant for petitioner testified as follows:

"When an account is out of business, or has left town or died, he would charge it off. This is not the normal accounting treatment. Normally, if an account is over 90 or 120 days old, serious consideration would be given to charging it off. In this case, it is not done; one reason is psychological; that is the account disappears from the records. When a list of accounts is turned over to a salesman for collection, if that account is not listed, the salesman would not make an effort to collect. An account is rarely charged off unless absolutely bad."

The credit manager of petitioner testified as follows:

"Petitioner does not like to lose control of accounts owing money, but does like to collect them. They are written off only when that particular account cannot be located, or if he has no assets."

**8.** There is no detailed information as to the "credit sales" except for these three years.

forth in the footnote.[9] In addition, there are three assignments which broadly and generally attack the sufficiency of the evidence to warrant the final determination of the Tax Court. Also, assignment 16 is a "catchall" for the fifteen preceding assignments.

The character, multiplicity and detail of these nineteen items poses the problem of the best practical method of considering these matters. To take each item separately in order to determine its place and importance in the entire picture would clearly be an impractical and unprofitable way to proceed.

9. "(1) The Court erred in failing to find that management prior to 1946 had set up Petitioner's reserve to bad debts by a formula based on 5% of accounts receivable.

"(2) The Court erred in failing to find that in 1946 and until about May, 1947, Schenley Company, a distiller who was interested primarily in procuring whiskey inventory and not operation, had owned and managed Petitioner.

"(3) The Court erred in failing to find that in May, 1947, management as well as ownership of Petitioner corporation was changed, and that a substantially different method of operation and a rapid expansion in credit ensued.

"(4) The Court erred in failing to find that credit limitations existing in 1948 were increased 50% in 1949, and 400 to 500 new and generally unfamiliar accounts, on which usually no credit reports were available, were added.

"(5) The Court erred in failing to find that in 1949 Petitioner extended credit for the first time to small accounts buying in broken case lots.

"(6) The Court erred in failing to find that at the end of 1949, fourteen accounts payable to Petitioner owed over $100,000, five of which had been frozen during the year, and that one of these accounts was delinquent for over $17,000, and another account was in financial difficulty and owed over $30,000.

"(7) The Court erred in failing to find in 1948 and 1947 collections were easier because whiskey was scarce and allocated, and retailers were thereby more inclined to pay their bills, but that collections had slowed in 1949.

"(8) The Court erred in failing to find that in 1949 Petitioner's officers had justifiably anticipated collections would slow down because whiskey had been in scarce supply and allocated, but was to be released, although the advent of the Korean War in 1950, and consequent stocking up and reduction of debts by retailers prevented this anticipated difficulty in collections from becoming a reality.

(9) The Court erred in failing to find that Petitioner's delinquent accounts increased in 1949 approximately $21 000 over the previous year, and continued to increase thereafter.

"(10) The Court erred in failing to find that usually 20%–25% of petitioner's credit sales were to chain stores or other businesses of established credit, and the balance were to individual proprietors who in the main were under-financed and on whom no reliable credit information was available.

"(11) The Court erred in failing to find that the credit sales to chain stores and other businesses of established credit ratings had declined over $200,000 in 1949, and the proportion of credit sales to such businesses as compared to individual proprietors of uncertain finances, and on whom no reliable credit information was available, declined from 25% in 1947 to 23% in 1948, and to 19% in 1949, increasing thereafter.

"(12) The Court erred in failing to find that collections in 1949 had declined proportionately with the decline of credit sales to chain stores and other businesses of established credit rating.

"(13) The Court erred in failing to find that Petitioner dealt primarily in nationally advertised brands, and that the loss of any one could reduce the collectability of accounts receivable by 50%.

"(14) The Court erred in failing to find that Petitioner was in a business subject to peculiar risks, legislative and otherwise.

"(15) The Court erred in failing to find that the examining agent relied solely on statistical experience as to bad debts from 1946 through 1952.

"(16) The Court erred in failing to find or consider, individually or collectively, material facts heretofore set forth.

"(17) The Court erred in finding that in 1949 Petitioner's addition to its reserve for bad debts was based on 4/10ths of 1% of charge sales.

"(18) The Court erred in not allowing any addition whatsoever to reserve for bad debts in view of the increase in bad debts which the Court determined the Petitioner did anticipate.

"(19) The Court erred in not giving due effect to circumstances and conditions existing in 1949 different from circumstances and conditions in immediately preceding and succeeding years."

As stated in the brief, counsel for petitioner recognize that their contention that the Tax Court failed to consider the various items which they set out with particularity is but a negative form of presenting the issue of the insufficiency of the evidence to sustain that Court. However, they say that their purpose was to "pin point the issue * * * and make sure it was not overlooked". Also, they reason that, as that Court failed to make findings as to each of these assignments, it did not consider them and that no correct conclusion could be reached without such consideration. Such an argument is skillful and not out of place, but it does not necessarily lead to the conclusion counsel urge. A factual picture of this kind may call for many lines and colors to give the scene its entire verity. However, some may be of heavy or even commanding import; and, in determining the ultimate issue the Court need only give weight to and indicate the matters which induced its decision. It does not have to include in the finding and opinion every detail of the factual situation revealed by the evidence. Nor is there any assumption that the omission of some fact from the statement of the findings or of the opinion which compels the conclusion that such fact was not noticed nor considered by the Tax Court. It is quite rarely that the reviewing court cannot readily determine the factual basis for the action of the Tax Court.

The "Findings of Fact" and the "Opinion" are each brief and they reveal clearly the conclusions and the reasons therefor which resulted in the determination of the Tax Court. We think quotations of the essential portions of each followed by comments upon them and upon the items pressed by petitioner will better serve the situation. Such parts of the Findings are in footnote 10 and of the Opinion in footnote 11.

10. "Petitioner, a corporation, was organized under the laws of the State of Missouri. It kept its books and filed its income tax returns on an accrual basis and used the reserve method of accounting for bad debt losses. Petitioner filed its income tax return for 1949 with the collector of internal revenue for the first district of Missouri.

"Petitioner is engaged in the wholesale liquor business and has been in existence since 1934. It conducted its business only in the State of Missouri. It sells liquor to chain stores, hotels, retail liquor dealers and taverns. The present stockholders acquired control of the corporation around May 1, 1947.

"Under regulations issued by the Liquor Commission of Missouri liquor may not be sold by petitioner to a customer whose account is unpaid for 30 days or more, until such customer pays his account. Such an unpaid account is called a "delinquent" or "frozen" account. There might be a large number of frozen accounts in one month and a small number in the next. From 90 to 95 per cent of petitioner's accounts have been delinquent at one time or another.

"Petitioner is the exclusive distributor of a name brand. Customers on the delinquent list could not purchase this name brand of whiskey or any other brand exclusively sold by petitioner until they had paid their account. In December of each year delinquent accounts decreased for the reason that every customer wanted to get off the delinquent list so that he could purchase ample merchandise for December.

"At the end of the calendar year 1949 petitioner's president, a certified public accountant, and the credit manager, went over the accounts to determine the appropriate reserve. The president was one experienced in the liquor industry in Arkansas, Louisiana, Texas, and Missouri. He was also vice president of the Missouri Liquor Dealers' Association. The certified public accountant had over 10 wholesale liquor businesses as his clients. He was familiar with the liquor business.

"It was not the practice of petitioner to charge off as a bad debt an account simply because it became delinquent. Petitioner was conservative in his charge-offs and wrote them off only when a particular account could not be located or had no assets and the debt was uncollectible. Petitioner adhered to this practice, not only to stimulate salesmen and others to collect, but also to avoid violation of the law by reselling a delinquent account.

"During 1949 petitioner liberalized its credit policy by increasing limits to accounts and granting credit to more cus-

tomers. In 1949 petitioner's addition to its reserve for bad debts was based on 4/10ths of 1 per cent of charge sales. After this addition, the balance in the reserve account amounted to approxi-

mately 5 per cent of accounts receivable. The following table shows the 1949 addition to reserve for bad debts as it compares to other accounts on petitioner's books:

| "Year Ended | Credit Sales | Accounts Receivable End of Year | Bad Debts Charged to Reserve |
|---|---|---|---|
| 12–31–46 | | $123,633.22 | $ 1 0 |
| 12–31–47 | $1,707,014.34 | 291,922.26 | 1,861.33 |
| 12–31–48 | 2,484,779.15 | 320,812.49 | 1,287.14 |
| 12–31–49 | 2,308,186.90 | 365,094.90 | 6,579.86 |
| 12–31–50 | | 429,156.42 | 5,957.95 |

| "Year Ended | Bad Debts Recovered | Addition to Reserve | Reserve Balance End of Year |
|---|---|---|---|
| 12–31–46 | $350.00 | $1,034.79 | $ 1,234.79 |
| 12–31–47 | 0 | 7,454.60 | 6,828.06 |
| 12–31–48 | 65.73 | 9,939.12 | 15,480.04 |
| 12–31–49 | 241.69 | 9,232.75 | 18,374.62 |
| 12–31–50 | 2 381.50 | 5,957.95 | 18,374.62 |

"1 There was an actual bad debt of $1,-034.79 which was charged directly to expense. Thus, although the reserve had been increased by reason of this particular account, the reserve account has not been reduced by the charge off (made directly against expense).

"2 Reported as income.

"The Respondent explained the adjustment to petitioner's 1949 net income as follows:

"(a) You claimed a deduction on your income tax return for bad debts in the amount of $9,232.75, which represented the amount of the increase in the reserve for bad debt account, whereas the information on file shows the balance in the reserve for bad debts account is sufficient without any increase. The amount of the increase of $9,232.75 is, therefore, disallowed and income increased accordingly."

11. "In the present case petitioner claimed that a sum of $9,232.75 for 1949 was a reasonable addition to its bad debt reserve. However, respondent determined that the amount claimed by petitioner was not a reasonable addition because the balance in petitioner's reserve account at the end of the year was sufficient to meet anticipated bad debts without any addition to the reserve.

"The fundamental issue, whether the addition is reasonable, is a question of fact and should be based on such things as a taxpayer's past experience, general business conditions, the nature of the business, and the amount of the existing

reserve. See Mill Factors Corporation, 14 T.C. 1366, 1372.

"During 1949 petitioner charged some $6,579.86 of bad debts to the reserve. At the end of the year, with petitioner's addition of $9,232.75 and the addition of $241.69 of bad debts recovered, the balance in reserve was $18,374.62. The balance in the reserve account at the beginning of 1949 was $15,480.04. This means that the balance in the 1949 reserve account was $9,141.87, after adjustments for bad debt losses and recoveries, but before making an addition to the reserve. This amount was more than one and one-third times the aggregate 1949 bad debts, and 1949 was the highest bad debt year for the period 1946 through 1949.

"By the addition of $9,232.75 petitioner more than doubled its bad debt reserve. We can not find from the record that petitioner anticipated doubling its credit sales or its accounts receivable in 1949. Further, there is not sufficient evidence to find that petitioner anticipated doubling its bad debt losses. There is evidence of such things as greater competition in the whiskey business and petitioner's assumption of more credit risks, but these would only support a finding that petitioner anticipated an increase in bad debts. However, without any addition to the reserve for bad debts, the balance in the bad debt reserve account at the beginning of 1950 would have permitted an increase in that year of almost 40 per cent over 1949 bad debt losses.

"The credit record for years after 1949

In this controversy, an arresting consideration is petitioner's method of handling and disposing of difficult accounts—particularly with reference to charge off as bad debts. Petitioner, apparently as did other wholesale liquor dealers, followed an entirely abnormal method as to such. The accountant, who attended to the business of petitioner and of many other wholesale liquor dealers, testified that the method of dealing with "charge-off" accounts was not according to normal accounting practices because of certain considerations peculiar to the wholesale liquor business.[12]

This accountant testified that, in his opinion, "the adequacy of the reserve cannot be fairly stated from the bad-debt charge-off experience of the com-

pany. Accounts were never handled this way in the experience of the witness unless for a wholesale liquor house."

The testimony of these witnesses establishes that the method and practice of wholesale liquor dealers in handling bad accounts are much more indulgent than those ordinarily employed in the usual run of business generally. This attitude inevitably and often must cause many of such liquor credit accounts to be carried beyond the tax year when they would be charged off under ordinary sound accounting principles applied in business generally.

Our immediate concern, however, is not whether or to what extent this unusual situation would be affected by the principle that bad debts should be charg-

is admissible as corroboration of the reasonableness of respondent's determination. Black Motor Co. v. Commissioner of Internal Revenue, 41 B.T.A. 300, affirmed 6 Cir., 125 F.2d 977. From this we find that bad debts charged to petitioner's reserve were $5,957.95 in 1950 and $2,974.40 in 1951. Thus, the balance in the reserve account at the beginning of 1949, without any addition to the reserve would have been sufficient for 1949, 1950, and 1951.
"In our opinion, considering the record as a whole, petitioner's addition of $9,-232.75 to its bad debt reserve in 1949 was unreasonable."

12. He (witness Garelick) testified:
"When an account is out of business, or has left town or died, he would charge it off. This is not the normal accounting treatment. Normally, if an account is over 90 or 120 days old, serious consideration would be given to charging it off. In this case, it is not done; one reason is psychological; that is the account disappears from the records. When a list of accounts is turned over to a salesman for collection, if that account is not listed, the salesman would not make an effort to collect. An account is rarely charged off unless absolutely bad. * * * Accounts were never handled this way in the experience of witness unless for a wholesale liquor house."
Witness Sherman (who owned most of corporate stock of petitioner and had had extensive wholesale liquor experience on a large scale) testified that "no credit terms exceeded thirty days". He further testified:

"Based on witness's experience the bad-debt charge-off of $6,579.00 in 1946 was not representative of the true credit risk involved because all accounts were not charged off that should have been. Petitioner's credit policy was not to charge-off accounts unless absolutely bad."
* * *
"No combination of the bad-debt charge-offs for 1944 through 1949 would properly reflect the credit risks of these accounts. Petitioner did not charge off the accounts as bad unless they were out of business, and then they were turned over to an attorney, and only when he gave up would they be charged-off."
* * * * * * *
"When an account went out of business petitioner tried to contact them and collect, and if that was not possible, turned it over to a collection agency, and when they advised it was uncollectable, petitioner would charge it off. There are some accounts which have been on the books for four years that have never been charged off. He just pays off $5.00 or $10.00. There's a colored tavern that has owed $400 to $500 for three or four years. He pays $5.00 every time the salesman catches him. As long as some money comes in on an account they don't charge it off."
Witness Mueller (credit manager and bookkeeper for petitioner) testified:
"Petitioner does not like to lose control of accounts owing money, but does like to collect them. They are written off only when that particular account cannot be located, or if he has no assets."

ed off during the tax year in which they become uncollectable. For the time being, we pass that by in order to ascertain whether, in any use of this method in this case, the Tax Court failed to give proper weight to some one or more of the items urged by petitioner which would have made its ultimate result unreasonable.

In pursuing this examination, we do so having in mind the basic reasons of the Tax Court for its decision. It is obvious that the controlling consideration in that Court was the financial history of the reserve and of the charge off. This history showed sizeable increases in annual additions to the reserve for the years 1947 to 1952 (both inclusive) except for 1950 when no addition was made; that at the end of 1949, after adjustments and charge off, but before addition to reserve, the balance in the reserve was more than one and one-third times the bad debts charged off in 1949, which was the heaviest charge off of any year—1947–52, inclusive; and that the reserve at the beginning of 1949 would have been sufficient to cover the total charge off for 1949, 1950 and 1951. To overcome such a definite showing of excessive addition for 1949, would require strong and unusual elements affecting that year.

We have painstakingly examined every separate item urged by petitioner. We have done this in the light of the argument in petitioner's brief; of the entire evidence, which has been studied in detail and completely read more than once; of the findings of fact; and of the opinion of the Tax Court. We are convinced that had the Tax Court incorporated in its findings every fact stated in these nineteen assignments, with accompanying clarification as shown in the evidence,[13] the determination of the Tax Court would not have been shaken.

 Hereinbefore, we noted, but laid aside temporarily, the matter of whether or how far petitioner's indulgent method of handling delinquent accounts might be affected by the time (tax year) when the debt became worthless and the time (tax year) the charge off thereof as a bad debt was made. It is firmly established that "bad debts" deduction is allowable only for the tax year in which the taxpayer became aware of its worthlessness and charged it off as such.[14] The rule is the same where the

13. We have no thought of impugning the good faith of counsel and we recognize that items in assignments should be condensed and concise. However, when a thought is lifted out of context, it sometimes loses its real meaning. To illustrate what we mean by "clarification" we take three examples.

Assignment "(3)" has to do with the effects of change in ownership and management resulting from the purchase from Schenley, May 1, 1947. It does not mention that corporate stock was bought by Mr. Sherman who for thirteen years before had been the largest wholesaler (35%–40%) of the wholesale liquor business in Arkansas; had been an officer of the National Trade Association; and (at time of this trial) was Vice-President of the Missouri Wholesale Liquor dealers' Association—that is, the new management was widely and recently experienced in the business.

Assignment "(5)" criticises failure to find that "Petitioner extended credit for the first time to small accounts buying in broken case lots". This refers only to "Small accounts in the immediate neighborhood would come in on Saturday morning for a quarter of a case, or an eighth of a case, or an assorted case. Credit policies were liberalized by giving an open account to those people for over the weekend; people not heretofore entitled to credit." Obviously, this was trivial in the business of the petitioner.

Assignment "(13)" has reference to the effect of a loss of an advertised brand upon the collectibility of accounts receivable. There was no evidence that petitioner lost such a brand in 1949 or that such a loss was threatened in the future.

14. Lunsford v. Commissioner of Internal Revenue, 5 Cir., 212 F.2d 878; Russell Box Co. v. Commissioner of Internal Revenue, 1 Cir., 208 F.2d 452; Dunbar v. Commissioner of Internal Revenue, 7 Cir., 119 F.2d 367, 135 A.L.R. 1430, annotation; earlier annotations, 130 A.L.R. 212; 121 A.L.R. 697; 67 A.L.R. 1015; 55 A.L.R. 1280.

taxpayer uses the bad debt reserve method.[15] Of course, the taxpayer is allowed reasonable latitude in determining if and when an account or debt (in any form) becomes worthless so long as taxpayer acts in good faith (135 A.L.R. 1431–1434).[16]

We advert to these legal principles governing deductions for bad debts because the method of handling bad debts seems to have factors in the wholesale liquor business which are peculiar to it and which seem not in accord with ordinary good business practices. These include the psychological and practical methods described hereinbefore. The methods appear to be particularly hazardous in connection with the attitude toward the strike offs of accounts—a situation in which the taxpayer has the heavy burden of justifying a tax deduction.

■ Petitioner complains that "The testimony on the part of the Commissioner merely consisted of mathematical computations * * *." Mathematics are always an integral element in determining the amount of every addition to a reserve for bad debts. This is mirrored in the "primarily" dependent matters set forth in the second paragraph of the Treasury Regulation No. 111 quoted in footnote 1 above. On the other hand, other considerations may outweigh mere figures. Each case rests on its own facts. In this case, the other pertinent facts fail to overcome the "mathematics" of the situation. We must and do hold that the petitioner has failed to sustain its burden of proof that the determination of the Tax Court was unreasonable; and, thereby, has failed to justify its action in deducting the addition to its bad debt reserve for 1949.

The order of the Tax Court is Affirmed.

15. In S. W. Coe & Co. v. Dallman, 7 Cir., 216 F.2d 566, at page 569, the Court declares as follows:

"Taxpayer does not claim that the reserve for bad debts as determined by the Commissioner was, in fact, not sufficient to cover the actual charge offs for the year ending March 31, 1944, or for the two previous years. Taxpayer, in effect, argues that the function of a reserve for bad debts is to protect it against excessive losses in future depression years. From a viewpoint of sound business management it may be wise to accumulate surplus funds against future contingencies but such is not the type of reserve contemplated by § 23(k) (1), and is not allowable as a deduction for bad debt reserve."

16. Curry v. Commissioner of Internal Revenue, 2 Cir., 117 F.2d 307, 309, after approving the *bona fide* doctrine, continues as follows:

"But it seems manifest to us that when a taxpayer knows the worthlessness of a debt in a certain year and yet chooses to indulge in hopes that something may still be realized from a claim that at the time has neither collectibility nor market value, he ought not to be allowed to delay taking his deduction until all his hopes or illusions are completely dispelled, for it had ceased to have a commercial value. While the test of ascertainment is a subjective one, and the taxpayer will not lose his right to deduct a worthless debt through a mere error of judgment, proof that in a particular year the facts known to him indicated the worthlessness of the debt and that it was then actually worthless seems to justify an inference that he then ascertained it to be worthless."