Roth Packing Co., a Corporation v. Commissioner.
Roth Packing Co. v. Commissioner
Docket No. 83257.
United States Tax Court
T.C. Memo 1962-78; 1962 Tax Ct. Memo LEXIS 231; 21 T.C.M. (CCH) 403; T.C.M. (RIA) 62078; April 9, 1962
*231 Held: That the respondent did not err in disallowing as deductions amounts claimed by the petitioner as reasonable additions to its reserve for bad debts for the taxable years 1956 and 1957. Malcolm D. Young, Esq., for the petitioner. Jack Morton, Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax for the taxable years 1956 and 1957 in the respective amounts of $9,339.16 and $2,656.36. The only issue presented is whether the respondent erred in disallowing as deductions amounts claimed by petitioner as reasonable additions to its reserve for bad debts for each of the taxable years. Findings of Fact Some of the facts are stipulated and are incorporated herein by this *232 reference. The petitioner is a Nebraska corporation with its principal place of business in Glenwood, Iowa. It maintains its accounting records and files its income tax returns on an accrual method of accounting. Its Federal income tax returns for the taxable years in question were filed with the district director of internal revenue at DesMoines, Iowa. Ever since its incorporation on January 22, 1951, petitioner has been in the meat packing business. It ships meat in carload lots to various parts of the United States. Although it deals in hides and also makes some local sales of meat to local businessmen as an accommodation, these are minor portions of its business. Petitioner slaughters and ships about 40 carloads of beef a week, the shipments having an average value of about $9,500 to $11,000 and consisting of about 28,000 pounds of meat each. Its annual volume of sales is about $20,000,000.00. For the years 1956 and 1957 its gross sales, as shown by its returns, were $16,543,876.75 and $15,100,859.63, respectively. The petitioner sells to chain stores, such as A. & P., Winn-Dixie, and National Tea Company, and also to so-called "breakers" in such cities as New York, Boston, *233 and Philadelphia. "Breakers," as distinguished from chain stores, are generally small independent organizations which apparently buy in carload lots and break the shipments down into smaller portions for disposition. About 70 percent of petitioner's products is sold to breakers. The petitioner's sales to chain stores are on open account. The large chain stores usually have good credit and there is little risk exposure in selling to them. There is greater risk exposure in selling to breakers, with respect to some of whom it is difficult to obtain good credit information. As a result of serving the petitioner and other packing houses in the Omaha area, the petitioner's bank obtains information about breakers who are poor credit risks and in such cases warns the petitioner and such other packing houses. Some of the petitioner's sales to breakers are on open account, but other sales to them are made by use of an order bill of lading, in which cases payment must be made before receipt of the meat. The percentage of sales which is made by bills of lading varies considerably from time to time, depending upon economic conditions; at times only 60 or 70 percent of weekly sales to breakers *234 may be by order bills of lading, while at other times such sales may be as high as 80 percent. Most sales on open account are kept open for less than one month; actually the petitioner tries to obtain payment for all sales within 7 to 10 days from the time of sale. Sales, payments for which are made after 7 to 10 days, are considered by the petitioner as slow paying accounts. In such cases the petitioner generally refuses to make further sales to those customers. In instances where meat is shipped with an order bill of lading and the buyer refuses to pay the bill and accept the meat, it is necessary for petitioner to attempt to sell the meat at whatever price it can get at the place where the meat has been shipped. This usually results in selling the meat at a lesser price, since the time taken to find the new buyer usually allows the meat to become stale and thereby worth less. In such instances the difference is treated by the petitioner on its books as adjustments to sales, rather than as bad debts. The petitioner pursued the policy of reducing its year-end accounts receivable in order to show a more favorable balance sheet by turning over some types of accounts receivable to *235 its bank for collection. The bank gave petitioner credit in the amount of such accounts, subject to collection. Such accounts receivable are not assigned to the bank, and under the bank's policy the petitioner's account would be charged if collection were not effected within 15 to 17 days. However, in no instance was it ever necessary to charge the petitioner's account. At the end of 1956 and 1957 there were approximately $157,000 and $185,000, respectively, of petitioner's accounts receivable in the hands of the bank upon which the petitioner had received credit. The petitioner's aggregate outstanding accounts receivable as of the end of the years 1951 to 1957, inclusive, without reference to any accounts receivable held by the bank were: Accounts Re-
Year
ceivable
1951
$163,633.90
1952
48,889.69
1953
199,378.20
1954
236,055.75
1955
230,512.63
1956
272,737.81
1957
248,605.21
The petitioner has, ever since its inception, maintained the reserve method of treating bad debts. An analysis of the bad debt reserve account of the petitioner for the years 1951 through 1957, is as follows: Year End
Date
Debit
Credit
Balance
Explanation
12-31-51
$ 6,342.86
$ 6,342.86
Set up Bad Debt Reserve
12-31-52
4,942.76
Addition to Reserve
12-31-52
$4,835.25 [1]
6,450.37
Bad debts charged-off
12-31-53
9.79
6,440.58
Bad debt charge-off, Ralph
Stoddard
12-31-54
9.79
Recovery of Ralph Stoddard
account
12-31-54
6,909.38
Addition to Reserve
12-31-54
9,685.82
3,673.93
Bad debt charge-off Liberty
Packing Co.
3- 5-55
12.50
Bad debt charge-off White
City
12-31-55
12,639.89
Addition to Reserve
12-31-55
5,141.39
11,159.93
Adjust 1955 Bad Debt Provi-
sion
12-31-56
6,605.85 [2]
17,765.78
Addition to Reserve
12-31-57
6,000.00
23,765.78
Addition to Reserve
*236 The following is an analysis of petitioner's accounts receivable account at the end of the year 1956: Balance
When Obligation
When Obligation
Name of Account
12-31-56
Arose in 1956
Paid in 1957
A. & P. Tea Co., Buffalo
$ 6,610.26
12/28
1/7
A. & P. Tea Co., Detroit
25,451.35
12/24, 29, 31
1/7, 9
A. & P. Tea Co., Mineola
18,025.02
12/27, 28
1/7
A. & P. Tea Co., Bronx
32,219.78
12/24, 26, 29
1/19
A. & P. Tea Co., Louisville
7,565.52
12/31
1/9
A. & P. Tea Co., Maspeth
30,057.69
12/28, 30
1/11, 14
A. & P. Tea Co., Hawthorne, N. Y.
10,788.38
12/26
1/14
A. & P. Tea Co., Philadelphia
16,905.46
12/26, 28
1/7, 9
A. & P. Tea Co., Washington, D.C.
23,165.02
12/19, 26, 27
1/10, 19
A. & P. Tea Co., Newark, N.J.
26,605.38
12/22, 26, 27
1/7, 11
A. & P. Tea Co., Westwood, Mass
10,630.14
12/31
1/15
Al Nieto, Bronx
1,770.89
12/27, 29
1/7
Government Employee Purchases
129.23
various dates
1/15, 25
Frank Guarino, Chicago
182.50
12/29
1/7
Guggenheim Brothers, Chicago
661.54
12/24, 29
1/4, 10
H. A. Salzman, Rock Island, Ill.
685.28
12/5
1/28
Joliet Packing Co., Joliet, Ill.
19,397.16
12/28
1/7
J. Krieger
573.76
12/27
1/4
Mayfair Packing Co.
17,043.58
12/15
1/9
12/31
2/1
Miscellaneous Sales
41.65
12/2
1/4
Orleans Canning Co.
862.00
12/24, 29
1/7, 9
Proctor & Gamble
4,204.92
12/28
1/4
Safeway Store, Glenwood, Ia.
368.96
12/26
1/26
Schroeder Feed Mill, Tabor, Ia.
530.10
12/29
1/11
Sinai Kosher Sausage, Chicago
748.22
12/24
1/7
Standard Meat Co., Chicago
970.97
12/24
1/9
341.90
12/29
1/14
Vienna Sausage Co., Chicago
851.26
12/29
1/11
Wilno Kosher Sausage, Chicago
890.15
12/29
1/11
Winn-Dixie, Inc., Greenville, S.C.
14,459.74
12/29
1/7
Total Accounts Receivable, 12/31/56
$272,737.81
*237 The following is an analysis of petitioner's accounts receivable account at the end of the year 1957: Balance
When Obligation
When Obligation
Name of Account
12-31-57
Arose in 1957
Paid in 1958
Alex Meat Specialties
$ 1,859.13
12/19, 27, 31
1/3, 18
A. & P. Tea Co., Baltimore, Md.
9,577.62
12/26
1/18
A. & P. Tea Co., Bronx
11,589.79
12/27
1/13
A. & P. Tea Co., Detroit
40,700.24
12/20, 23, 30
1/17
A. & P. Tea Co., Maspeth, N. Y.
11,217.38
12/21
1/4
A. & P. Tea Co., Norfolk
47,021.03
12/24, 31
1/9, 23
A. & P. Tea Co., Yeadon, Pa.
34,720.41
12/21, 26, 27
1/9
A. & P. Tea Co., Washington, D.C.
43,029.80
12/19, 26, 27
1/10, 13
A. & P. Tea Co., Youngstown, Ohio
11,566.99
12/31
1/9
Al Nieto, Bronx
4,529.74
12/19, 21, 28
1/7
Davis Market, Glenwood, Ia.
409.87
12/24, 31
1/7, 13, 14
Frank Guarino
2,799.98
12/29
1/10
Government Employee Purchases
6.89
Gaylord Market
91.20
12/31
1/13
Haskell Produce, Omaha
130.54
12/31
Hermes Drive-In, Glenwood, Ia.
28.35
12/23
1/22
John Roth & Son, Omaha
11.20
12/27, 31
1/8
J. Krieger, Brooklyn, N. Y.
577.51
12/26
1/4
Knauss Bros., Poughkeepsie
10,195.58
12/17
1/13
Midtown Packing Co., N. Y.
(1,000.00)
(credit)
Proctor & Gamble, Cincinnati
4,500.00
12/31
1/8
Payroll Deduction
18.77
1/11
Red & White, Randolph, Ia.
$ 9.52
12/30
2/4
Safeway Stores, Glenwood, Ia.
3,710.37
11/26, 12/3, 10,
11, 17, 24
1/4
713.59
12/31
2/3
Schroeder Feed Mill, Tabor, Iowa
1,041.20
12/21, 24, 27, 31
1/6, 14, 17, 22
Schukerts, Omaha
400.35
12/17, 18, 20, 24
1/3
Sinai Kosher Sausage
5,665.06
12/26, 28
1/3, 13
Vienna Sausage, Chicago
1,804.69
12/26, 28
1/9
Wilno Kosher Sausage Co., Chicago
2,491.83
12/26
1/6
General Journal entry of auditor (J-142,
12/31/57), allowance against December
sales
(813.42)
Total Accounts Receivable 12/31/57
$248,605.21
*238 C. A. Buscher, who has been engaged in the meat packing business for about 36 years, has been president of the petitioner since its incorporation, and has been responsible for the petitioner's credit policies and for establishing the petitioner's policy with respect to its bad debt reserve. It was he who determined that at the end of the taxable year 1956 the bad debt reserve should be increased to $17,765.78 by the addition thereto of an amount of $6,605.85, and that at the end of the taxable year 1957 such reserve should be increased to $23,765.78 by the addition thereto of an amount of $6,000. His determination was made after personally examining the individual accounts receivable and considering the total amount of accounts outstanding, as was his custom each year, and after discussing the matter with petitioner's auditors. In determining such amount he took into consideration the fact that sales were generally in carload lots, resulting in individual accounts receivable in the approximate amount of $10,000, and the fact that he considered that there was a business recession in 1956 and 1957 and that the risk would be greater if such recession should continue. As shown in the *239 above analysis of the bad debt reserve account, the petitioner charged against its reserve on December 31, 1954, as a bad debt, the amount of $9,685.82 owing from Liberty Packing Company. In 1954 such customer owed the petitioner for two loads of meat, in the approximate amount of $20,000, and had ordered a third load. Buscher was able to induce the customer to pay for one of the loads which had previously been delivered, and then refused to ship any further meat to such customer, thereby limiting the possible loss on such customer. The account receivable of Knauss Brothers in the amount of $10,195.58, shown in the list of accounts receivable as of the end of 1957, was incurred on December 17, 1957, and was paid on January 13, 1958. At December 31, 1957, Buscher was concerned about this account because it had not been paid. This customer had been slow to pay in the past. At some time not established by the record, Knauss Brothers owed the petitioner approximately $25,000, and the petitioner adopted a policy of insisting upon payment before making further shipments. Petitioner continued to ship to such customer in 1958, and as a result sustained a loss in an undisclosed amount in *240 that year. In its return for the taxable year 1956 the petitioner claimed a bad debt deduction in the amount of $6,121.53, which was the amount of the addition to the reserve in that year in the amount of $6,605.85, minus an amount of $484.32 representing a partial recovery on the Liberty Packing Company account which had been charged against the reserve in 1954. In the notice of deficiency the respondent determined that any addition to the reserve for the taxable year 1956 was unreasonable. He therefore disallowed the amount claimed by the petitioner as a deduction for that year. However, instead of disallowing the amount of $6,121.53 which the petitioner had actually deducted in its return, the respondent disallowed the amount of $6,605.85 which the petitioner had added to the reserve for bad debts. This had the effect of increasing the petitioner's reported taxable income by $484.32 more than the petitioner had deducted. In its return for the taxable year 1957 the petitioner deducted the amount of $6,000 which had been added to the reserve as of the end of the year 1957. In the notice of deficiency the respondent disallowed this claimed deduction, determining that any addition *241 for 1957 was unreasonable. Neither the amounts of $6,121.53 and $6,000 claimed by the petitioner as deductions for the taxable years 1956 and 1957, respectively, nor any portions thereof, constituted reasonable additions to its reserve for bad debts for those years. Opinion The question presented is whether the respondent erred in holding that the petitioner is not entitled to deduct any amount as a reasonable addition to its reserve for bad debts for the taxable years 1956 and 1957, pursuant to section 166(c) of the Internal Revenue Code of 1954 and the regulations promulgated thereunder. [1]
*242 Section 166(c) of the Code provides that in lieu of specific deductions for bad debts, "there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts." Essentially a bad debt reserve constitutes an estimate of the loss which can reasonably be expected to result from debts outstanding at the close of the taxable year. The ultimate question is whether the balance in the reserve at the end of the year is adequate to cover such expected losses. Under the reserve method the reserve is reduced by charging against it specific debts which become worthless, and is increased by crediting to it any recoveries on debts previously charged off. The taxpayer is then entitled to deduct the amount of the addition to the reserve which is necessary to bring the year-end balance to the appropriate amount. On the other hand, if such balance in the reserve is already adequate to cover the amount of the year-end accounts receivable which reasonably can be expected to become worthless, the taxpayer is not entitled to deduct an addition to the reserve. See Ira Handelman, 36 T.C. 560, O. P. Lutz, 29 T.C. 469, *243 and R. Gsell & Co., 34 T.C. 41 (reversed on other issues (C.A. 2), 294 F. 2d 321). In determining the amount of a reasonable addition to a reserve an important consideration is the taxpayer's past experience in collecting its accounts. However, there must also be taken into consideration the circumstances existing at the time the estimate is made, including conditions of business prosperity. Black Motor Co., 41 B.T.A. 300, affd. (C.A. 6), 125 F. 2d 977, and R. Gsell & Co., supra.See also section 1.166-4 of the Income Tax Regulations.
Where, as here, the respondent has, in the exercise of his discretion as provided by statute, determined that a claimed addition to a reserve is not reasonable, the burden of proof is upon the petitioner to show that the respondent has abused his discretion. Paramount Liquor Co. v. Commissioner (C.A. 8) 242 F. 2d 249, affirming a Memorandum Opinion of this Court, S. W. Coe & Co. v. Dallman, (C.A. 7) 216 F. 2d 566, Union National Bank and Trust Co. of Elgin, 26 T.C. 537, and C. P. Ford & Co., 28 B.T.A. 156. *244 The petitioner contends that its additions to the reserve were reasonable since, it claims, the balance in the reserve resulting from such additions was necessary in order to cover losses which might reasonably be anticipated from its accounts outstanding as of the end of each of the taxable years 1956 and 1957. It argues that it was subject to risk of loss in relatively large amounts since customarily sales were made in carload lots at a price of approximately $10,000 per car, pointing to its experience in 1954 of finding it necessary to charge off approximately $9,700 as a bad debt resulting from the Liberty Packing Company account. It also points out that as of the end of 1957 it had on its books an account due from Knauss Brothers in the approximate amount of $10,200, about which it was concerned since that customer had previously been slow to pay. The petitioner also contends that at the end of each of the taxable years 1956 and 1957 an economic recession was in progress which must be taken into consideration in determining a reasonable estimate of losses which might be expected from the accounts receivable existing at such times. It is contended that there must be taken into *245 consideration not only the amount of accounts receivable existing on the books, but also those which had been turned over to the bank for collection. We have given careful consideration to all the evidence of record, including the opinion testimony of an official of petitioner's bank, but have concluded and have found as a fact that neither the amounts of $6,121.53 and $6,000 claimed by the petitioner as deductions for the taxable years 1956 and 1957, respectively, nor any portions thereof, constitute reasonable additions to its reserve for bad debts for those years. The balance in the reserve account at December 31, 1956, prior to the addition thereto of $6,605.85, was $11,159.93. During 1956 and 1957 no bad debts were charged against the reserve. From 1951, the year of petitioner's incorporation, through 1955 the total amount of bad debts experienced by the petitioner was $14,049.25. The bad debts charged against the reserve during those years were relatively small, except for the Liberty Packing Company debt. It seems clear, therefore, that the petitioner's past history would not justify the deduction of any additions to its reserve. The balance of $11,159.93 would appear to *246 be adequate to cover any losses which might reasonably be expected upon the basis of petitioner's experience. (Such balance should, of course, be increased by the recovery in 1956 of $484.32 on the Liberty Packing Company account which had been charged off in 1954.) We also note that of the accounts receivable of $272,737.81 and $248,605.21 shown on the petitioner's books as of the end of the taxable years 1956 and 1957, respectively, $222,852.70 (about 82 percent) and $213,847.22 (about 86 percent), respectively, represented accounts receivable due from chain stores, which the evidence establishes were good credit risks. The record does not show the details as to the accounts receivable held by the bank at the end of the taxable years 1956 and 1957, in the respective amounts of $157,000 and approximately $185,000. Buscher's testimony indicates that they may have consisted, at least in part, of chain store accounts, and it may be that they included some accounts arising out of sales made upon order bills of lading. In any event, the record shows that in no instance had the bank ever found it necessary to charge the petitioner's account because of failure to collect any accounts turned *247 over to it. It would thus appear that the accounts which might have been considered as subjecting the petitioner to risk of loss would be the remaining accounts receivable shown on its books as of the end of the taxable years 1956 and 1957, in the respective amounts of approximately $50,000 and approximately $35,000. Of these remaining accounts, it is to be noted that there were only two relatively large ones in 1956 and one in 1957. Although Buscher testified that he examined all the accounts outstanding at the end of each year, the only one as to which he specifically stated that he had any concern was the account of Kanuss Brothers in the amount of $10,195.58 outstanding at the end of 1957. He stated that his concern with respect to that account was due to the fact that that customer had been slow to pay and that it was necessary to limit sales to Knauss as he had in the case of the account of Liberty Packing Company in 1954. Even though there may have been some reasonable question as to the Knauss account, it is obvious that even if it were considered as uncollectible in full, the reserve in the amount of $11,159.93 would be sufficient to cover such anticipated loss. Buscher *248 testified, in effect, that in 1956 and 1957 there was a minor business recession and that the risk would be greater if the trend should continue. [2] Such testimony, however, is not sufficient, in our opinion, to establish that conditions were such as to reasonably lead to the belief that they would have any substantial effect upon the collection of the particular accounts outstanding as of the end of the years in question, In this connection it may be stated that the effect any recession might have upon accounts receivable subsequently arising would have no bearing upon the determination of the reserve contemplated by the Code. See S. W. Coe & Co. v. Dallman, supra.
Upon a consideration of the whole record, we cannot conclude that the petitioner has shown that there *249 was an abuse by the respondent of his discretion in determining that petitioner was not entitled to deduct any addition to its reserve for bad debts in the years in question. Indeed, the stipulated facts show that all the accounts outstanding at the end of each of the years 1956 and 1957 were paid - practically all of them in January following the close of the year. The Knauss account, which arose on December 17, 1957, was paid on January 13, 1958. These facts corroborate the reasonableness of the respondent's determination. Paramount Liquor Co. v. Commissioner, supra, and Black Motor Co., supra. The petitioner has made much of the fact that at the hearing counsel for the respondent stated that the respondent had computed, under the formula set forth in Black Motor Co., supra, total reserve requirements for the petitioner as of December 31, 1956 and December 31, 1957, in the respective amounts of $2,843.08 and $2,809.24. We find it unnecessary to here determine precisely what balance would be appropriate in the bad debt reserve account as of those dates. Suffice it to say that we are of the opinion that the reserve was adequate without any *250 additions and that consequently the petitioner is not entitled to deduct any additions to the reserve for such years. In view of the foregoing, we approve the respondent's determination except to the extent that he disallowed for the taxable year 1956 a greater deduction than that actually taken by the petitioner in its return for that year. Decision will be entered under Rule 50. Footnotes
1. Uncollectible Accounts Receivable written-off by petitioner 12-31-52: Colonial Provisions
$ 429.46
Fairway Meat
1,317.76
Guggenheim
700.36
Harris Beef Co.
1,438.64
B. Anderson
3.98
North River
498.96
White House Beef
446.09
$4,835.25
Buscher testified as follows: Well, in '56 and '57, I think more or less that we had a little condition that looked like we were going to go downhill a little bit, in fact, it was what you call a recession, and, of course, the gamble would be bigger if this would continue on. Taking it up with our auditors, we felt that it was right and fitting and proper that we enhance this to protect ourselves.
[2]↩ In 1956, petitioner received a bad debt recovery of $484.32 on the 1954 Liberty Packing Company charge-off. The amount of $484.32 was credited directly to bad debt expense. After debiting bad debt expense in 1956 for $6,605.85 for the increase to the bad debt reserve account, a net bad debt deduction of $6,121.53 resulted as shown on petitioner's 1956 income tax return.
1. Section 166 of the Internal Revenue Code of 1954 provides in part: SEC. 166. BAD DEBTS. * * *
(c) Reserve for Bad Debts. - In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts. § 1.166-4 of the Income Tax Regulations provides in part: § 1.166-4 Reserve for bad debts. (a) Allowance for deduction. A taxpayer who has established the reserve method of treating bad debts and has maintained proper reserve accounts for bad debts or who, in accordance with paragraph (b) of § 1.166-1, adopts the reserve method of treating bad debts may deduct from gross income a reasonable addition to a reserve for bad debts in lieu of deducting specific bad debt items. (b) Reasonableness of addition to reserve - (1) Relevant factors. What constitutes a reasonable addition to a reserve for bad debts shall be determined in the light of the facts existing at the close of the taxable year of the proposed addition. The reasonableness of the addition will vary as between classes of business and with conditions of business prosperity. It will depend primarily upon the total amount of debts outstanding as of the close of the taxable year, including those arising currently as well as those arising in prior taxable years, and the total amount of the existing reserve. (2) Correction of errors in prior estimates. In the event that subsequent realizations upon outstanding debts prove to be more or less than estimated at the time of the creation of the existing reserve, the amount of the excess or inadequacy in the existing reserve shall be reflected in the determination of the reasonable addition necessary in the current taxable year.↩